[No. S005970. June 1, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH WILLIAM HART, Defendant and Appellant.

**COUNSEL**

Philip H. Pennypacker and Richard Phelps Stookey, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Keith I. Motley and Pamela A. Ratner, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Following the guilt phase of the trial, a jury found defendant Joseph William Hart guilty of one count of first degree murder of Diana Lynn Harper (Pen. Code., §§ 187, 189),[1] and found true the special circumstances that the murder was committed while defendant was engaged in the commission of, attempted commission of, or immediate flight after commission of the crimes of rape and sodomy. (§ 190.2, subd. (a)(17)(C), (D).) The jury also found defendant guilty of rape, sodomy, and oral copulation of Amy R. (§§ 261, 286, 288a.) At the penalty phase, the jury fixed the penalty at death. The trial court denied the automatic motion to modify penalty. (§ 190.4, subd. (e).) Thereafter, the court imposed a sentence of death.

This case reaches us on automatic appeal. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We affirm the judgment in its entirety.

### FACTS

The evidence at trial established that shortly before noon on March 24, 1986, the murder victim, Diana (known as Diane) Lynn Harper, and her friend, Amy R., each 15 years of age, decided to leave the Riverside County high school in which they were enrolled as students, to meet Diane's boyfriend at a local 7-Eleven store. In the parking lot of the store, Diane began conversing with a stranger, who told her that he had found a marijuana patch and needed someone to watch the road while he harvested the plants. He offered the girls $1,000 to serve as lookouts. The girls entered his vehicle, and the man drove them 30 to 40 miles, stopping once to purchase beer, and again to obtain storage bags for carrying the marijuana. At trial, Amy identified the man as defendant.

The car stopped at a dirt road in a rural area. Defendant told Amy to wait by the vehicle, and he and Diane walked up the path and out of Amy's view. Shortly thereafter, defendant returned and asked Amy to help him carry the bags. Amy went with him and saw Diane's partially clothed body lying facedown on the ground. Diane appeared to be dead or unconscious. Amy tried to run away, but defendant caught her, tore her clothes, forced her to orally copulate him, and raped and sodomized her. Amy testified at trial that defendant explained to her: "I'm really sorry I had to do this, but you know, I had a shitty day . . . ."

Defendant informed Amy that "your friend was an asshole, she called me a few names, and I think she's dead." He also told Amy that he planned to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

hit Amy with a rock to render her unconscious. By misleading defendant into believing that she had been abused as a child, and promising that she would not contact the police, Amy persuaded defendant not to knock her out, and eventually he drove her back to a location near the 7-Eleven store. He gave her a quarter to phone home, and drove away. Amy immediately contacted her sister and, shortly thereafter, spoke with law enforcement officers. Later that evening, Amy directed the officers to the crime scene, where Diane's body was found. The cause of Diane's death was identified as massive cerebral contusions and hemorrhage, caused by external trauma to the head.

Law enforcement investigators recovered evidence indicating that Amy and Diane each had been sexually assaulted. A fingerprint matching that of defendant was recovered from a beer bottle found close to Diane's body. Tire impressions found in the vicinity of the murder scene were consistent with those of defendant's vehicle, which Amy also identified as the one she and Diane had entered. Shoeprints were consistent with a partially burned shoe found in a 55-gallon drum outside defendant's residence. Other physical evidence also connected defendant to the crime scene. Defendant was arrested on May 8, 1986—five days after the murder of his young niece, Shelah McMahan. In a police lineup, Amy was shown five individuals including defendant, and collapsed upon viewing him; immediately thereafter, she identified defendant as the man who had assaulted her. Defendant's time cards indicated that, on the day the crimes were committed, he worked until 11:30 a.m. on a construction job near the 7-Eleven store where the girls were picked up. A few days later, one of defendant's coworkers observed that defendant had a bandaged hand and that his right arm was in a sling; the physician who treated defendant's injury testified that it was commonly known as a "boxer's fracture," because it typically is sustained by striking a closed-fist blow against a fixed or hard object.

## I. *Guilt Phase Evidence*

### A. *The Prosecution's Case*

#### 1. *Overview*

The prosecution's theory of the case was that defendant's effort to entice the girls into his vehicle and drive them to a remote area was part of a premeditated plan to commit rape, and that the murder of Diane was committed in the course of perpetrating rape. To establish that theory, the prosecution presented Amy's testimony, and introduced physical and circumstantial evidence linking defendant to the crimes.

#### 2. *The Events of March 24, 1986*

Amy testified that she and Diane left high school on March 24, 1986, stopping first at a nearby Der Weinerschnitzel restaurant for a soda, then at

another restaurant, Don Jose's, where Diane submitted an application for employment. The girls thereafter crossed the street to an area adjacent to a 7-Eleven store to wait for Diane's boyfriend, David Starbuck.

A brown Toyota vehicle entered a nearby driveway, and Diane began conversing with its driver. Amy joined in the conversation. The driver informed the girls that "he had found a marijuana field and he had a lady that was going to go with him and she couldn't make it, and he couldn't take another day off work and . . . I guess [the marijuana] wasn't his, and so he needed someone to watch the road while he went and chopped down the marijuana. . . . He just wanted one of us." The man informed the girls that he would pay $1,000 for the assistance he requested, adding that "we would be back in an hour."

The girls decided that if one of them were going to accompany the man, they both would do so, and so they entered his vehicle. Amy noticed an orange towel on the dashboard. Amy told Diane: "Oh, David is going to kill you for doing this." The man responded: "Will he kill you for making a thousand dollars in an hour? Why would he kill you for making a thousand dollars in an hour?"

Amy estimated that the three of them thereafter traveled about 30 or 40 miles, stopping at a Circle-K store because the driver said he was thirsty. The man returned to the car with a six-pack of Budweiser beer in bottles. The three drank the beer. The man informed the girls that he would need bags to put the marijuana in "[a]nd that it wouldn't be cool to put it in a white plastic bag." He sent Amy back into the store to obtain some paper bags. The trio then drove to a Thrifty store where the girls procured more bags. Next, they traveled to a hardware store, because the man said "the marijuana was thick and that he needed to get a hatchet to chop it down with." The man entered the store for the purpose of purchasing a hatchet, emerging shortly thereafter without one, however, informing the girls that the hatchet cost $15, which was too much money for him to pay. He explained, "It's okay because I have a screwdriver in the trunk."

Diane responded: "I have this knife if you want to use that," and gave the man a small buck knife that she kept in her purse. Amy expressed her displeasure with this arrangement, and the man returned the knife to Diane. The trio then drove for awhile on a freeway, exiting near a field. The man tried to drive the vehicle into the field, but was unable to do so. He told the girls, "I know another way to get in," and they kept driving.

The car proceeded onto a dirt road near a sign that read, "80 Acres for Sale," passing a Volkswagen car shell. The vehicle stopped; the occupants

emerged from the car, and the man removed the bags from the trunk. He told Amy to watch the road while he and Diane harvested the marijuana. Before departing, the man relieved himself; while he was doing so, the girls agreed to call to each other to make sure everything was all right. But after a few minutes, the man and Diane returned, the man informing the girls that the marijuana patch was not there. They returned to the car, and drove to where the dirt road stopped at a dead end. The man put the cap on his beer bottle, placed the bottle in a white plastic bag, and left the bag outside the car. The man and Diane walked up a dirt path, while Amy stayed by the vehicle. Diane had her knife with her.

Amy waited for about 15 or 20 minutes, picking at the label on her bottle of beer. She started calling Diane's name, but heard no response. She threw the bottle into a bush. She noticed a bumper sticker on the man's vehicle. It read, "Skier." She also noticed the license plate holder, which exhibited the words, "Have a Nice Day."

At some point thereafter, the man returned to the vehicle, alone. He informed Amy that Diane was cooling her feet in a spring and that he needed Amy's assistance to carry down the bags. Amy followed the man up the trail. Informing her that he saw a snake, the man picked up a rock. Amy told him to give it to her. The man did so, saying, "But I'll have to get another one, you don't want me to get killed, do you?" Amy gave the rock back to the man.

At approximately the same time, Amy saw Diane's body, partially clothed and lying facedown. Frightened, Amy started to run back down the path. The man chased her, hitting her in the back with a rock, causing her to fall down. He started punching Amy in the face, and the two fell into a gully. Amy pleaded with the man to let her hear Diane say something. The man repeatedly told her to shut up, that Diane was unconscious and unable to speak. "You're kind of funny, kid," he added, "I'm about to rape you and all you can do is think about your friend."

The man stood behind Amy, tore her blouse, pulled her skirt up, and ripped off her panties. She noticed that his trousers were down and he was holding his penis, "just slapping it back and forth." Angrily, the man kept telling her, "Don't look at me." But Amy continued to glance back at the man. "It's hard for me to get it up after I just got it on with your friend," he explained.

The man attempted to sodomize Amy. Repeatedly unable to achieve penetration, he turned Amy around, asking her, "How are you at giving

head, kid?" He placed Amy on her knees, telling her, "Do it," and shoved his penis into her mouth. After the man achieved an erection, he turned Amy around, began biting her neck, and sodomized her.

Amy asked the man if he was going to kill her. He replied, "I've done this in people's houses and I've never killed anyone yet." He then dragged Amy back up the path toward Diane's body, telling her that she had better shut up or he was going to get his Vaseline. While he was dragging Amy along, he picked up a small square jar of Vaseline.

The man threw Amy down and forced her to orally copulate him again. He applied the Vaseline to himself. Then he raped her.

Amy asked the man again if he was going to kill her. He said that he was going to render her unconscious by hitting her on the back of the neck with a rock. Amy suggested that he tie her up instead, dig a hole, and place her in the hole. The man agreed that it would be a good idea to tie her up, and did so with her blouse and bra.

The man informed Amy that he had to find Diane's knife, but his efforts to locate it were unsuccessful and he returned to Amy, telling her that "your friend was an asshole, she called me a few names, and I think she's dead." Amy replied that there was no reason he also had to kill her. The man repeated his desire to render her unconscious to allow him time to get away. Amy pleaded with the man not to hit her, concocting a false story that when she was three years old, her father used to hit and beat her, and that she was afraid of being hit.

Upon hearing Amy's pleas for mercy, the man's attitude began to change. He said he understood what Amy had gone through "because I was raped myself by three [B]lack men and I'm really sorry I had to do this, but you know, I had a shitty day. . . ."

Amy continued to promise that she would not tell anybody, so he untied her and took her back down the trail, repeatedly complaining, "You made me hurt my hand, kid." Amy noticed that his hands were "really dirty" and "permanently stained." Still fearing for her life, Amy asked the man to hold her hand. Instead, he put his arm around her and continued to express remorse. He placed Amy in his vehicle, and the pair drove away. When Amy asked whether she could disclose Diane's whereabouts, the man replied: "I wouldn't do that. . . . This is what you're going to tell them. You're going to tell them it was a [B]lack man, a [B]lack man took you—if you have to tell them anything."

He added: "I'm putting 15 years of my life in your hands, kid." Amy renewed her promise not to discuss the incident, to which the man replied, "But that doesn't matter because by the time they pick me up . . . I can get out before the . . . sentencing. . . . Anyway, I've got two good friends that would do anything for me."

The man dropped Amy off approximately one block from a 7-Eleven store. As Amy emerged from the car, the man warned her not to call the police. Then he gave her a quarter to phone home and departed. Amy called her sister, informing her of the incident. The sheriff's department was contacted, and Amy later accompanied detectives to search for Diane.

### 3. *The Crime Scene Investigation*

Riverside County Sheriff's Department Detective Richard Moker testified that, in the evening of March 24, 1986, he accompanied Amy in an effort to locate Diane's body. He described the manner in which he and other law enforcement officers attempted to retrace the route the girls had taken, the officers relying upon Amy's description of the stores the trio had visited, distinctive road signs they had observed, and the crime scene terrain. At approximately 11:00 p.m., after nearly six hours of searching, the officers located the Volkswagen shell. Shortly thereafter, the officers found a white plastic sack containing a Budweiser six-pack container. Fearful that the man who assaulted her might be lurking in the area, Amy asked the officers whether they were armed and indicated that she wanted to leave as soon as possible. She also told them where Diane's body could be found. Thereafter, one of the officers transported Amy to the hospital to enable her to undergo a rape examination, while investigators searched the crime scene.

On cross-examination, Detective Moker testified that when he first encountered Amy, she informed him that Diane could be found "lying on her back" (thereby conflicting with Amy's testimony that she saw Diane lying facedown).

Riverside County Detective Michael Lackie testified regarding the investigation law enforcement officers conducted at the crime scene in the early morning hours of March 25, 1986, describing the steps he and Detective Moker took to avoid disturbing evidence found at the scene. In addition to encountering Diane's lifeless and bloodstained body (unclothed below the waist, with panties wrapped around one leg), officers located nearby a buck knife with the blade extended, a shoe impression, a Budweiser beer bottle, and paper grocery bags. Farther away from Diane's body, officers found four different tire impressions and a shoe impression at the spot where Amy said

defendant had parked the vehicle, a white plastic sack containing an empty Budweiser beer bottle with a cap on it, a discarded Budweiser beer bottle with the label partially picked off, and Amy's torn undergarments. Lackie testified that the shoe impression found near the spot where the vehicle had been parked appeared to resemble a similar impression found near Diane's body. He added that officers were unable to locate any marijuana growing in the area.

James Hall, a criminalist employed by the California Department of Justice, assisted in the investigation of the crime scene on March 25, 1986. Hall checked Diane's body for loose hairs and fibers, collecting what appeared to be a loose pubic hair from Diane's thigh.

Michael Renney, a senior evidence technician employed by the Riverside County Sheriff's Department, testified that on March 26, 1986, he tested for the presence of fingerprints several items recovered from the crime scene, obtaining a latent print from the Budweiser beer bottle found in the white plastic sack.

### 4. The Victims' Injuries

Dr. Claire McArthur, an emergency room physician employed by Riverside General Hospital, testified that in the early morning of March 25, 1986, she examined Amy, discovering a large bruise on Amy's upper back, abrasions about both knees, and a bruise to Amy's perineum (the area near the vagina and rectum). Dr. McArthur also found sand-like particles in Amy's vagina, a circumstance that Dr. McArthur testified would be "highly unlikely" in the absence of penetration. On cross-examination, Dr. McArthur acknowledged that she asked Amy whether she had been sodomized, and that Amy had responded in the negative. On redirect examination, Dr. McArthur testified that sexual assault victims Amy's age typically are "very reluctant" to discuss a sexual assault, and opined that Amy had been the victim of such an assault. Criminalist James Hall testified that Amy's slip bore a seminal fluid stain.

Dr. Dewitt Hunter, a Riverside County pathologist, testified that on March 26, 1986, he performed an autopsy on Diane's body. The autopsy revealed that the cause of Diane's death was major trauma to her head that led to massive cerebral contusion and hemorrhage; her body also exhibited minor trauma in certain other locations, and exhibited evidence indicating that Diane had been sexually assaulted. With regard to the head injuries, Dr. Hunter testified that Diane had suffered several "crush-type lacerations" and a skull fracture, most likely caused by a rock or brick-like instrument.

Diane's face also had numerous contusions and abrasions, consistent with her head having been pushed into the dirt. Her larynx contained foreign vegetable material (such as a leaf or twig) indicating that it had been inhaled shortly before death. The middle of her back revealed an extensive contusion. Diane's iliac crest (the front of the pelvic bone) showed abrasions consistent with someone having kneeled or sat on her back. Diane's knees, elbows, and buttocks also showed abrasions. There was a reddening of the vaginal area consistent with the application of force, and there were abrasions and "ill-defined" contusions on her inner and upper thighs consistent with an effort to force apart Diane's legs. Although no seminal fluid was discovered on Diane's body or clothing, a Vaseline-like substance was found around her vaginal area and inner thighs.

5. *The Brown Toyota With the Message "Have a Nice Day"*

Riverside County Sheriff's Department Sergeant Ronald Wade testified that on May 4, 1986, approximately six weeks after Diane and Amy were attacked, he observed a vehicle that appeared to be similar to the description of the suspect vehicle involved in the Diane Harper homicide. The vehicle, a brown Toyota Corolla, was parked next to a mobilehome in the Mead Valley area. Wade returned the next day and observed that the vehicle bore certain distinctive markings, including decals on the rear bumper and a license plate frame that read, "Have a Nice Day." Wade proceeded to the mobilehome on May 6 and spoke with an individual who identified himself as "Joe Hart." (At trial, Wade identified the individual with whom he spoke as defendant.) Wade asked defendant where he was working on March 24, 1986. Defendant replied that he was working in the Riverside/La Sierra area at McKinley and Magnolia Avenues; defendant checked his pocket calendar to verify his recollection. The location was not far from the spot where Diane and Amy had been picked up that day. Detective Lackie subsequently testified that the distance between the locations was 1.9 miles and required approximately four minutes of travel time by car.

Upon returning to the Riverside Sheriff's Department headquarters, Wade contacted the California Department of Justice in Sacramento for the purpose of obtaining Hart's criminal history and fingerprints. Michael Renney testified that he subsequently examined these known fingerprints of defendant and matched that of defendant's right ring finger to the latent print Renney obtained on March 26 from the Budweiser beer bottle found in the white plastic sack at the crime scene. Joe Sypnicki, a latent print examiner employed by the California Department of Justice, testified that he, too, compared the two prints, concluding "[t]here is absolutely no doubt whatsoever" that the latent impression lifted from the Budweiser beer bottle is that

of defendant's right ring finger. On cross-examination, Sypnicki acknowledged that no known method exists for ascertaining the date a particular fingerprint was made, and he therefore could not render an opinion as to the age of the print found on the beer bottle.

Having been informed of Sergeant Wade's observations, Detective Michael Lackie traveled on May 7, 1986, to the Mead Valley address occupied by Hart and obtained consent from Hart's wife, Linda, to examine the brown Toyota parked in the driveway. Lackie brought photographs of the tire impressions found at the crime scene, and determined that each of the vehicle's tires had a different tread design and that each appeared to match the impressions depicted in the photographs. The license plate frame read "Have a Nice Day." The vehicle had other distinctive features similar to those Amy had described to law enforcement officers. A "fairly fresh," torn portion of a bumper sticker depicting the letters, "I E R," lay on the ground; it appeared to partially match the "SKIER" bumper sticker Amy had recalled seeing on the vehicle. Lackie also observed, strewn about in the yard adjacent to the residence, Budweiser beer bottles similar to the type that Amy described defendant as having purchased on March 24. Lackie also saw Marlboro 100 cigarette butts in the vicinity; Amy had informed officers that defendant had smoked Marlboro 100's. Similar beer bottles and cigarette butts had been recovered at the crime scene. Lackie also saw an orange towel located in a planter attached to the residence.

### 6. *Defendant's Arrest and the Ensuing Searches*

Detective Lackie testified that after he completed his observations of the brown Toyota and the surrounding yard area, he learned from another investigator that one of defendant's fingerprints on file appeared to match a fingerprint located on a bottle found in the plastic sack at the crime scene. Lackie thereafter obtained a search warrant, returning to the Hart residence on May 8, 1986, to execute the warrant. By the time Lackie arrived at the residence, law enforcement officers already had taken defendant into custody.

Detective Moker testified that he placed defendant under arrest on May 8, 1986. Moker recalled that at the time of defendant's arrest, defendant's hair was "fluffy or wavy or dry looking . . . [with] the part in the middle . . . ." Detective Lackie testified that at the time of the arrest, defendant wore soiled pants and had "extremely soiled hands."

Detective Lackie further testified that law enforcement officers seized the brown Toyota (and another vehicle) in order to conduct a subsequent search.

In the mobilehome, officers found a jar of Vaseline in the master bedroom, another jar of petroleum jelly in the bathroom, and Marlboro 100 cigarettes. Outside the residence (crumpled up against the fence at the edge of the property), Lackie found two more pieces of a bumper sticker that appeared to have been torn from the "SKIER" bumper sticker on the brown Toyota. Lackie found a pair of matched tennis shoes, partially burnt, in a 55-gallon drum that appeared to have served as an incinerator. The tread design on the shoes appeared to match certain shoe impressions found at the crime scene. Lackie described the shoes at the time they were discovered in the drum as having been in "pretty good condition . . . . There were no obvious gouges, tears, marks, signs of destruction that I could see other than what was created by the burns—burning." Lackie also observed Circle-K plastic sacks among trash located at the side of the mobilehome.

Criminalist James Hall testified that on the day of defendant's arrest, he obtained various evidence exemplars from defendant's body, including those taken from defendant's pubic hair. Hall compared defendant's pubic hair with the specimen recovered from Diane's thigh, concluding that the hairs were "microscopically similar and, therefore, the evidence hair [found on Diane] could have come from Mr. Hart." Hall also compared the loose pubic hair with an exemplar taken from Diane's body, noted microscopic differences, and opined that the loose hair had not come from her.

Hall testified that he examined Amy's slip and panties, identifying on the panties human bloodstains of an indeterminable ABO blood type. Hall identified ABO type B blood on Amy's blouse (Diane had ABO type B blood, Amy had type O, and defendant had type A). Hall identified a seminal fluid stain on Amy's slip; on cross-examination, he testified that ABO typing and enzyme typing of the stain were inconclusive, and he was uncertain as to the date the stain was made. On redirect examination, Hall stated that defendant is a "nonsecretor," which means that an examination of defendant's bodily fluids would not disclose his blood type. Hall acknowledged that the inconclusive nature of the tests conducted on the seminal stain could be due to the strength of the stain, the passage of time, or the nonsecretor status of the donor. Hall identified saliva on the Marlboro 100 cigarette butts collected at the crime scene, but tests as to the blood type of the donor did not yield a blood type, a result Hall testified he would expect if the donor were a nonsecretor.

Hall testified that on May 10, 1986, he examined defendant's vehicle, recovering orange cloth fibers from the dashboard area of the car's interior.

### 7. Amy's Identification of Defendant

Amy attended a law enforcement lineup on May 12, 1986, in which she observed five individuals through a one-way mirror. Upon recognizing one

of the individuals, Amy fell, believing that "the floor would be safer." She noted on the sheriff's form that the individual she picked out had "different hair color, looked younger." In court, she identified that same individual as defendant, and as the man who had picked her up in the brown Toyota.

Riverside County Sheriff's Department Senior Investigator Dennis Harter testified that he was present at the police lineup in which Amy identified defendant as the suspect in her case. Harter testified that as soon as defendant (who occupied the second position in the lineup) entered the lineup room, Amy gestured in his direction and "immediately grabbed her mouth as if to keep herself from yelling, she began to cry and she ducked down to the ground" below the one-way viewing glass. Harter described Amy's emotional state when she viewed defendant as "very distraught"; after the participants in the lineup departed from the room, Amy "began to cry uncontrollably." Harter added that after she regained some composure, Amy stated, "It's No. 2, he killed Diane, he killed Diane."

Harter recalled that at the lineup, Amy noted that defendant's hairstyle appeared different from what it had been on the day she and Diane encountered him. Detective Moker testified that at the lineup, defendant's hair "appeared to be wet or oily . . . and it was combed almost straight back. . . ." When Harter returned to the jail the next day to visit defendant, defendant's hair appeared as it did at the time of defendant's arrest. Photos depicting defendant's appearance at the lineup, and on the day thereafter, were admitted into evidence.

### 8. Other Evidence

Faye Ann Springer, a criminalist employed by the State of California Department of Justice, testified that she attended Diane's autopsy, removing some of the victim's pubic hair that appeared to have a foreign material on it, and concluding that the substance was consistent with petrolatum, found in Vaseline. Springer found a similar substance on Diane's slip. Springer also compared a fiber found in Amy's shoe with an exemplar taken from a carpet mat found in defendant's brown Toyota vehicle, concluding that the fibers appeared to be identical. She examined photographs of the crime scene tire impressions, concluding that the tread designs for each of the four tires were similar to the exemplar tire impressions (derived from defendant's vehicle). Springer compared photographs depicting shoe impressions at the crime scene, concluding that they matched the photographs of the exemplars she received. On cross-examination, Springer acknowledged that none of the foregoing similarities was unique; petrolatum is found in several personal care products, and the carpet fiber and tire and shoe impressions were derived from mass-produced products.

Joan Baker, the office manager for defendant's employer (Joe Verska, General Engineering Contractor), testified that defendant worked for the company from February to May 1986. She recognized her own handwriting on his weekly time card filled out on March 26 or 27, 1986; she explained that defendant had been unable to fill out the time card, because "he had hurt his hand and it was bandaged and his arm was in a sling." The time card showed that on March 24, 1986, defendant worked two hours.

Dr. David Fisher, an orthopedic surgeon, testified that on March 28, 1986, he treated defendant for a hand injury sometimes referred to as a "boxer's fracture," because it is incurred by a close-fisted blow against a hard or fixed object, adding that the injury is "very common to occur within an altercation of some kind." On cross-examination, Dr. Fisher acknowledged that the injury could occur if someone were to fall with a clenched fist.

David Crocker, a field biologist employed by the Metropolitan Water District of Southern California, testified that on April 15, 1986, he was collecting water samples at Lake Mathews (located near La Sierra Boulevard, the street on which the victims' high school was situated). He and a colleague spotted a woman's black purse near the lake; upon opening the purse, they discovered personal items and Diane's high school identification card. Crocker and his colleague gave the purse to associates, who recognized the identification as that belonging to the high school student who recently had been murdered. The purse was given to law enforcement officers.

Kenneth Widney, defendant's father-in-law, testified that defendant often wore baseball-type hats, including hats with the letters "C A T" on them. He further testified that at some point prior to defendant's arrest on May 8, 1986, he observed two pieces of plywood placed in front of defendant's vehicle and a third piece of plywood on top, leading Widney to opine that defendant was trying to hide the car. Widney also testified that a yellow sticker that read "Caution Child in Car" was placed in the rear window of the vehicle shortly before defendant was arrested.

Dr. Craig Rath, a clinical psychologist, testified that on many occasions he had studied a type of criminal who, in many ways, was "relatively socialized," but who experiences a buildup of tension preceding the commission of a rape (or series of rapes), which then dissipates the tension. Dr. Rath testified that such an individual informally is known as a "binge rapist." On cross-examination, Dr. Rath acknowledged that he did not examine defendant.

B. *The Defense Case*

The defense called Amy, the surviving victim, as its initial witness, and questioned her regarding the events of March 24, 1986, and her participation

in the ensuing investigation conducted by law enforcement officials. Amy acknowledged that she willingly joined Diane and the driver of the car for the trip to locate the marijuana patch. Amy also acknowledged initially misleading officers, untruthfully informing them that Diane might have known the perpetrator (because "I didn't want us to get in trouble"), and that the perpetrator was a Black man (because that was what her assailant had instructed her to say). On cross-examination, she confirmed that neither she nor Diane knew the man who assaulted them.

Riverside County Deputy Sheriff James Shannon testified that when he encountered Amy at the 7-Eleven in the late afternoon of March 24, 1986, she told him, " 'Diane's dead, I know she is, Diane's dead.' " She also told him that she had seen Diane unclothed, and "laying on her back"; upon seeing Diane's body, Amy "started to scream and . . . the suspect hit her several times on the back with a rock." Amy described her assailant to Shannon as being a "Negro male," shortly thereafter changing her description. On cross-examination, Shannon testified that Amy explained she initially had given a false description of the suspect because she feared retaliation from the man. Amy described the man as a Caucasian male, approximately 35 years old, wearing a baseball-type cap with the letters "C A T" on it. Shannon further testified on cross-examination that Amy might have told him that she had seen Diane's back (rather than Diane lying on her back). During Shannon's questioning of Amy, she was crying, trembling, emotionally upset, and distraught.

Riverside County Detective Dennis Harter testified that during an interview he had with Amy in June 1986, Amy stated that she did not see any blood on Diane's body, or on the hands of the man who assaulted her. Harter reviewed the sequence of events of March 24, 1986, as Amy related them to him during the interview, noting that with regard to the allegation of sodomy, Amy told him that the man "stuck his penis in her butt . . . she said she could feel it moving in and out."

Riverside County Detective Richard Moker testified regarding his interview with Amy, conducted on March 26, 1986, noting that at one point Amy indicated the man who assaulted her and Diane had, as an inducement for them to join him in the search for the marijuana patch, offered each one of the girls a pound of marijuana to sell. Moker acknowledged that the report he prepared following the interview paraphrased the substance of his interview and contained certain technical terms not used by Amy to describe what occurred when she was sexually assaulted. In an interview Moker conducted on March 27, 1986, Amy told him that when the man released her following the assault, the man gave her directions to tell her sister as to how

to reach the location where he had dropped Amy off, and gave her a quarter for a telephone call.

Riverside County Detective Michael Lackie testified that his report of the autopsy conducted on Diane Harper's body, indicating a lack of trauma in the vaginal and anal areas, was erroneous, "and in checking with Faye Springer and other people who were at the autopsy, they told me they clearly understood Dr. Hunter to have made some statement there was signs of sexual assault and there was quite a big to-do in the office because I had written the report and I guess I had missed it." Lackie also testified that in an interview with Amy, conducted on April 2, 1986, Amy informed him that she (Amy) had used marijuana on a daily basis, but not on March 24, 1986, the date the crimes were committed. In response to a question posed by the prosecution, Lackie testified that on March 26, 1986, he ordered blood testing of Amy and Diane's blood, and that the results indicated there was a small amount of alcohol in each girl's system, and no evidence of marijuana or any other drug.

California Department of Justice Criminalist James Hall testified regarding the analysis performed on the stain found on Amy's slip, indicating that an electrophoresis test was inconclusive as to whether the stain was from seminal or vaginal fluid. On cross-examination, Hall testified that a different test, known as the "P-30" test, indicated the presence of a protein that is a component of semen. On redirect examination, Hall acknowledged that he was unable to determine the age of the stain.

Defendant did not testify, and the prosecution offered no rebuttal.

In his closing argument to the jury, defense counsel conceded that defendant took the girls to the remote area and assaulted them, killing Diane. He urged the jury to conclude, however, that Diane had been killed in the course of defendant's having committed, or having attempted to commit, sodomy—and not rape—and that the evidence therefore supported no more than a verdict of second degree felony murder.[2]

At the conclusion of the guilt phase, the jury found defendant guilty of having committed first degree murder, rape, sodomy, and oral copulation,

---

[2]As noted, the crimes were committed in 1986, prior to the enactment of Proposition 115. Under the law at that time, section 189 limited the types of sex offenses that would support a conviction of *first degree felony murder* to rape (§ 261) and lewd or lascivious acts with a child under the age of 14 years (§ 288). Although murder committed in the course of a sodomy was a special circumstance which, if found true, would support imposition of the death penalty, a jury at the time could consider the sodomy special circumstance only after finding defendant guilty of having committed first degree murder. Thus, in arguing at trial that defendant had committed sodomy, but not rape, and that defendant had not acted with deliberation or premeditation in killing Diane, defense counsel sought to persuade the jury

and found true the special circumstance allegations that the murder was committed during the commission of rape and sodomy.

## II. *Penalty Phase Evidence*

### A. *The Prosecution's Case*

The prosecution introduced evidence of five prior offenses committed by defendant, in addition to evidence of the subsequent uncharged murder of defendant's eleven-year-old niece.

#### 1. *Debra B.—February 1973 Assault*

Debra B. testified that in February 1973, when she was 26 years of age, she lived next door to the parents of defendant's first wife, Kathy, in Anaheim. While Debra was partially dressed one morning, defendant appeared without shoes in her kitchen. He said that he had locked himself out of the house next door, and asked to use the telephone. Debra repeatedly asked defendant to leave. "[T]hen just very suddenly he lunged at me and started choking me," Debra recalled. The pair fell to the floor. During the ensuing struggle, Debra bit defendant's hand, causing it to bleed. The struggle ended, and defendant informed her that he could not stop himself from entering people's homes. Debra arranged for defendant to speak with one of the ministers at her church. The minister contacted the local police, who placed defendant under arrest.

During the ensuing search of defendant's person, officers found a knotted piece of rope, 42 inches in length, a pocket knife, a piece of electrical wire, 39.5 inches in length, and a key to Debra's residence.

#### 2. *Priscilla N.—February 1973 Assault*

On February 22, 1973, Priscilla N., 18 years of age, was employed as the manager of an apartment complex located in Imperial Beach. At dusk, a man asked her to show him an apartment. Once inside, he grabbed her, and the two struggled to the floor. After she repeatedly screamed, the man ran out of the apartment. She reported the incident to the police, initially identifying another man as her attacker. When defendant was questioned by investigating officers with regard to the Valerie T. and Deborah T. incidents, described below, he admitted attacking Priscilla with the intent to rape her.

---

that defendant was guilty of no more than *second degree felony murder*, in the hope of sparing defendant from a penalty phase and the possibility that the jury would render a verdict of death. (§§ 190, 190.2.)

Under the current provisions of section 189 (not applicable to the present case), murder committed in the perpetration of, or attempt to perpetrate, sodomy (§ 286) is first degree murder.

### 3. *Valerie T.—January 1975 Sexual Assault*[3]

On January 19, 1975, at approximately 9:00 p.m., Valerie T. was walking to her residence, located in Imperial Beach, after having had dinner at a local restaurant. A man grabbed her from behind and placed one hand over her mouth, informing her not to scream. He pulled Valerie into an alley and removed his hand. She immediately screamed, and he placed the blade of a knife across her throat. He ordered her to remove her trousers; when she refused to do so, he did so himself, saying, "Don't look at me." He also ripped open her blouse and "mounted" her briefly. "[T]hen he got up and he said, 'Thank you, ma'am,' and took off down the street." Although Valerie could not recall whether the man's penis actually penetrated her, she subsequently detected wetness that "wasn't mine," and believed he had ejaculated. A few months after the incident (approximately the time period when defendant admitted to the police that he had attacked her), Valerie identified her assailant in a police photo lineup as defendant, subsequently identifying him again at the penalty phase of the trial.

### 4. *Marilyn S.— February 1975 Forcible Oral Copulation*

On the evening of February 26, 1975, Marilyn S. went dancing, returning to her Imperial Beach apartment at approximately 1:00 a.m. the next morning. After falling asleep on a couch, she awakened to find a man standing next to her; his hands covered her mouth and neck area. The man wore a ski mask over his face, with holes for his eyes, nose, and mouth. In one hand, he held an open pocketknife. He told Marilyn, "No sudden moves, or you'll get hurt." He taped her mouth shut and told her not to scream. The man began caressing Marilyn's breasts and attempted to remove her pantyhose. The tape eventually became loose and, in the hope of preventing a rape, Marilyn informed him that she was menstruating and had an infectious disease. The man forced her to orally copulate him, eventually ejaculating and forcing her to swallow his semen. He thereafter asked her for money. Marilyn replied that she did not have much, and that she had a young son to raise. The man informed her that he had keys to all of the apartments in the complex, warning her not to contact the police or he would harm her and her son. Because she did not see the man's face, Marilyn was unable to identify him to the police. One week later, however, while being questioned by the police in connection with the attempted burglary of Deborah T.'s residence, described below, defendant admitted his sexual assault upon Marilyn S.,

---

[3]At the time of trial, this witness's last name began with a different letter, but we shall refer to her as Valerie T., her abbreviated name in 1975 when the relevant events occurred.

explaining that he had gone to her apartment complex for the purpose of committing a rape.[4]

### 5. *Deborah T.—March 1975 Attempted Burglary*

Shortly after midnight on March 5, 1975, the police responded to a telephone call from Deborah T., regarding a possible prowler at the Imperial Beach apartment complex in which she resided. Police officers located defendant, barefoot, 30 to 40 feet from her residence, walking away at a fast pace, and detained him. Although Deborah was unable to identify defendant positively, fingerprints lifted from a window screen at her apartment subsequently were matched to those belonging to defendant. Defendant waived his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] and gave investigating officers a number of varying explanations as to what he was doing at the apartment complex at that hour, initially denying being near Deborah's window. The following day, after being reread his *Miranda* rights, defendant confessed that he had opened the window with the intent of sexually assaulting her. During this interrogation, defendant also described his involvement in certain other offenses that the prosecution offered as evidence in aggravation.

### 6. *Shelah McMahan—May 1986 Murder*

On May 3, 1986, the body of defendant's 11-year-old niece, Shelah McMahan, was found beneath a mattress, trash bags, and a rock overhang at a garbage dump located in Mead Valley. She had been stabbed numerous times in the neck. A thin rubber molding was wrapped loosely around her neck, and her hands had been tied tightly behind her with a plastic cable tie. Her forearms bore marks that appeared to have been made by handcuffs. Her shirt was ripped and pulled away from her chest. A semen stain was found on her pant leg. Shelah had lived next door to defendant, and had been missing since early that morning.

In the ensuing few days, defendant was seen using a tractor to grade his backyard. He told others that he was doing landscaping work.

On May 8, 1986, defendant was arrested for the crimes committed against Diane and Amy. Pursuant to a search warrant, police investigators searched

---

[4]Retired San Diego Police Officer Mervin Christian testified that defendant recounted in detail the incident involving Marilyn S. On cross-examination, Christian acknowledged asking defendant whether, "in comparison with other guys, do you consider your penis small?" Defendant answered this question affirmatively. Christian asked defendant whether he believed that circumstance to be the source of his problem. Defendant replied: "Yes, I have a complex about it."

his mobilehome and the surrounding yard, locating cable ties similar to the one found binding Shelah's wrists, as well as two sets of handcuffs buried under freshly turned soil within a shed located behind defendant's residence. A third set of handcuffs was recovered several weeks later.

An acquaintance of defendant's, William Parker, testified that in early 1986, he engaged in a lighthearted discussion with defendant regarding women and bondage, which led defendant to produce three sets of handcuffs from the trunk of a motor vehicle. Defendant told Parker "something to the effect of, 'this is what you need.' "

Criminalist James Hall testified that traces of blood found on one set of the handcuffs recovered from the shed matched Shelah's blood type, shared by approximately 0.8 percent of the population (i.e., approximately eight out of one thousand people). Criminalist Faye Springer testified that a fiber collected from one pair of handcuffs was similar to the fabric in a black T-shirt worn by Shelah when her body was discovered. The ligature marks on Shelah's arms resembled those made by the handcuffs. The cable tie that bound Shelah's wrists had an appearance and trademark similar to a cable tie recovered from defendant's bedroom. Springer also found a similarity between fibers recovered from Shelah's T-shirt and those collected from the carpet found in one of defendant's vehicles, a Ford Mustang.[5] Springer stated that animal hairs recovered from Shelah's body and from defendant's Mustang were similar to an exemplar taken from defendant's dog.

Dr. Rene Modglin, the coroner who performed the autopsy on Shelah's body, testified that the victim had been stabbed 16 times. The cause of death was a cut to Shelah's right common carotid artery. The victim's body bore other bruises and abrasions. Modglin noted that Shelah's breasts were more fully developed than was typical for a girl of her age. On cross-examination, Modglin testified that he found no evidence of injury to Shelah's vaginal or anal areas. He found no evidence of semen in her mouth or body, noting that the absence of such evidence did not necessarily mean that Shelah had not engaged in sexual intercourse near the time of her death.

Randy Gresham shared a county jail cell with defendant and another prisoner. Gresham testified as part of an agreement specifying that, rather than face exposure to a prison sentence of 15 years for his involvement in offenses unrelated to the present case, he would be sentenced to a maximum

---

[5]Prosecution witness Ronald Wade testified on cross-examination that Shelah's hands were found clutching "some greenish gold type carpet fibers." Wade acknowledged that these particular fibers had not been connected to defendant or to any of his possessions. On cross-examination, Faye Springer and Detective Phillip Sanchez testified similarly.

of 10 years. Gresham testified that defendant admitted murdering his niece and leaving her body "at a dumping area." According to Gresham, defendant described her as an 11-year-old with "big breasts," and "built a lot sexier . . . than an 11-year-old was." Gresham stated that when defendant discussed killing Shelah, he demonstrated stabbing motions and laughed as he acted out the killing. Defendant informed him that he killed the girl because he was nervous after having talked to her about his other sexual assaults, had made sexual advances toward her, and was afraid that she would inform her family. Defendant told Gresham that "he really liked Shelah, and did not want to kill her, adding, 'it['s] easier after you'd [sic] done it.'" While watching television with Gresham, defendant would compare the breasts of women on television with those of his niece. Defendant expressed concern to Gresham that sheriff's deputies were searching his backyard, "and he was worried about them searching it . . . . He didn't want them to find evidence out there."[6]

## B. *The Defense Case*

At the penalty phase, the defense presented evidence in rebuttal to the prosecution's case against defendant regarding the murder of Shelah. The defense also presented evidence in mitigation describing defendant's troubled upbringing and his personal and professional virtues.

### 1. *Defense Evidence Contesting the Claim That Defendant Murdered Shelah*

The defense presented evidence highlighting the large number of individuals who had access to the Widney residence (where Shelah lived), and in particular sought to cast suspicion on Bobby Asendorf, the brother of the boyfriend of Shelah's mother. Asendorf, who lived inside a bus parked on the property, was not permitted to babysit Shelah, because Shelah had a "crush" on him.

The defense also emphasized the forensic evidence that did not link defendant to Shelah's murder. This evidence included the green and gold carpet fibers found in Shelah's hand, the lack of blood found in defendant's Ford Mustang, the absence of hair matching that of defendant, and the presence of hair that matched neither Shelah nor defendant. A cigarette butt recovered near the body was analyzed for saliva and determined to reflect

---

[6]On cross-examination, Gresham acknowledged that he had used drugs heavily prior to his arrest, and suffered symptoms of withdrawal during the time that he was incarcerated with defendant. Gresham testified that he suffered seizures and "blacked out" a number of times. On one occasion, defendant administered cardiopulmonary resuscitation in order to revive Gresham.

type A secretor activity; defendant was a nonsecretor. Cable ties found near the body were dissimilar from those found at defendant's residence and upon Shelah's wrists. The molding found wrapped around Shelah's neck did not match moldings seized by investigators. A shoeprint found on a bedsheet with Shelah's body was dissimilar to shoes seized from defendant's residence. The bedsheet, itself, also was dissimilar to those found in the Widney residence and in defendant's residence.

To cast further doubt upon the prosecution's theory that defendant murdered Shelah, the defense presented evidence suggesting that Shelah died within 90 minutes of 10:44 a.m., May 3—i.e., a time when it was undisputed that defendant already had returned to his residence.

The defense sought to discredit inmate Randy Gresham's testimony by introducing evidence that Gresham had daily access to newspapers while incarcerated and that Gresham's plea agreement with the prosecution depended upon his testifying against defendant.

David Montgomery testified that he worked with defendant for Joe Verska Construction on the night Shelah disappeared. The pair met shortly after midnight to move sprinklers at a jobsite, a task that required approximately 90 minutes. Thereafter, they returned to defendant's vehicle and drank beer. Montgomery received a telephone call from defendant at approximately 8:00 a.m. that day.

Defendant's wife, Linda Hart, testified that early on the morning of Shelah's disappearance, she awoke at 2:30 a.m., to make sure that defendant had left for work; he already had left, returning shortly before 4:00 a.m. Linda Hart did not see any blood on defendant's clothing or shoes. He awakened her later in the morning, when it was light.

Linda Hart further testified that Shelah often went to church and to the grocery store with the Harts in their Ford Mustang. The Harts' dog also traveled freely between the Widney and Hart residences. Linda Hart explained that defendant had been grading the backyard on a continual basis, in an effort to produce a level yard.

On cross-examination, Linda Hart testified that although she recalled telling a detective, on May 4, 1986, that her husband was gone the previous day at 2:30 a.m., she did not remember telling the detective that the next

time she heard from her husband that day was at 7:00 a.m. She did not believe that her husband had killed Shelah or Diane.[7]

Shelah's mother, Paula McMahan, testified that many individuals visited—and occasionally resided at, or near—the Widney residence where Shelah lived. Because the Widneys had a washer and dryer, the McMahans and Harts often washed their clothes there, sometimes mixing the families' laundry together. Paula McMahan corroborated portions of Linda Hart's testimony, explaining that Shelah often played with defendant's daughters and dog, and frequently had been a passenger in the Harts' Ford Mustang. She added that plastic cable ties could be found in many locations on the Widney property. On cross-examination, Paula McMahan testified that Shelah was very responsible, and always asked permission to leave the property, even with someone familiar to her such as defendant.

Shelah's uncle, Steve Widney, testified that he used cable ties in his job as an installer of rooftop solar panels, storing the ties at various locations on the Widneys' property.

### 2. *Defense Evidence in Mitigation*

Defendant's father, Robert Hart, testified regarding his own career in the United States Navy, and the adverse impact that his absences and alcoholism had had upon his family. He praised defendant as having been a good child, an excellent husband, and a loving father. Robert Hart forced defendant to enlist in the Navy and, upon returning, defendant discovered that his first wife, Kathy, had been unfaithful. Defendant began using drugs at this time, was committed as a mentally disordered sex offender to Patton State Hospital, and his marriage to Kathy was dissolved.

Defendant's mother, Iris Hart, corroborated and expanded upon her husband's testimony. She also described a serious traffic accident involving defendant when he was four years of age, which led to his suffering a number of chronic problems, including headaches.

Defendant's first wife, Kathy, testified that defendant had been "a very good father." Defendant had attempted to be a good husband to Kathy, and was "devastated" to learn of her extramarital affair. She also described an

---

[7]With respect to Diane's murder, Linda Hart admitted that when investigators interviewed her, she indicated that she had used the Toyota to drive to work on March 24, 1986 (the date Diane was abducted and killed), and that defendant had visited her at lunchtime that day. She acknowledged that defendant could have borrowed the Toyota when he visited her that day. She denied that the Toyota ever had been hidden, adding that the orange towel had been removed from the dashboard prior to that date.

event, after the couple had divorced, when defendant visited her and saved the lives of some girls who had fallen into a river when their canoe capsized.

Defendant's second wife, Linda, testified regarding an incident involving a distraught neighbor who had slashed her wrists, explaining that defendant broke down a door, stopped the bleeding, and saved his neighbor's life. She described defendant as a devoted husband and a "fantastic" father, who, while incarcerated, sought to remain as involved as possible with his family. On cross-examination, Linda acknowledged (over an objection) that nine months after defendant's arrest, she asked another man to live with her for her protection and that of her children, eventually bearing the other man's child.

Several witnesses testified in praise of defendant's talents as a poet, songwriter, musician, husband, and father. Defendant was very involved with the local church, sang in the church choir, and taught children in Bible school. He was a hard worker who sought to provide for his family. A former employer described defendant as very dependable and honest.

### C. *Prosecution Evidence in Rebuttal*

Detective Sanchez testified that, during an interview with Linda Hart on May 4, 1986 (following the discovery of Shelah's body), she stated that her husband was gone at 2:30 a.m. the previous day, and the next time she heard from him was approximately four and one-half hours later, just before 7:00 a.m., when she heard defendant enter the trailer.

Linda Hart's sister-in-law, Cindy Widney, testified that on four occasions, defendant made overtures toward her, once suggesting lightheartedly that if their respective spouses returned "to mom and dad," the two of them could get married.

## DISCUSSION

### I. *Pretrial Issues*

#### A. *Whether Defendant Was Denied His Right to Trial by a Fair and Impartial Jury*

Defendant contends the trial court committed several errors during the voir dire examination of potential jurors and during the trial itself, thereby depriving him of his right to trial by a fair and impartial jury. (See U.S. Const., 6th Amend; Cal. Const., art. I, § 16.) Specifically, defendant contends the trial court inadequately examined potential jurors for bias and

prejudice. He also contends the trial court erred in failing to dismiss one juror for hardship. As we shall explain, defendant's contentions lack merit.

■ Initially, we observe that because defendant failed to challenge the jurors for cause or through the use of the peremptory challenges available to him, he is not entitled to relief on appeal. (See *People* v. *Danielson* (1992) 3 Cal.4th 691, 713 [13 Cal.Rptr.2d 1, 838 P.2d 729] ["[I]n light of the fact defendant failed to use his one remaining peremptory challenge . . . we need not resolve whether the court erred in failing to excuse [a particular] juror for cause."].) Upon the completion of the jury selection process, defendant had exercised only 14 of his 26 challenges against prospective jurors, and 3 of 4 challenges against prospective alternates. In fact, defendant explicitly acknowledged to the court that he was satisfied with the jury that had been selected. He therefore may not now complain that the jury was comprised of one or more persons unacceptable to him. (*People* v. *Morris* (1991) 53 Cal.3d 152, 185 [279 Cal.Rptr. 720, 807 P.2d 949] ["[A] party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors. Having so indicated in this case, defendant cannot reasonably claim error."].)[8]

In addition to this procedural flaw, defendant's contentions on appeal are unpersuasive on the merits.[9]

1. *Whether the Trial Court Deprived Defendant of His Right to a Fair and Impartial Jury by Failing in Its Sua Sponte Duty to Examine Jurors for Bias and Prejudice*

■ Defendant contends the trial court failed in its duty to conduct an adequate inquiry into potential jurors' biases and prejudices. (Former § 1078;[10] see also *People* v. *Crowe* (1973) 8 Cal.3d 815, 828 [106 Cal.Rptr. 369, 506 P.2d 193] [the dual purpose of section 1078 conferred "not only a

[8]Defendant contends that his trial counsel was ineffective in exercising only 14 of 26 peremptory challenges available to the defense. Because the record on appeal fails to shed light on the basis for counsel's decision, and because that decision is not one for which there could be no satisfactory explanation, we reject the claim. (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

[9]Throughout this opinion, we shall discuss the merits of particular claims, such as this one, even though they are procedurally barred, when we conclude that such discussion may be helpful in evaluating future claims alleging ineffective assistance of counsel. (See, e.g., *People* v. *Garceau* (1993) 6 Cal.4th 140, 173, fn. 10 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

[10]At the time of defendant's trial in 1987, section 1078 provided: "It shall be the duty of the trial court to examine the prospective jurors to select a fair and impartial jury. He shall permit reasonable examination of prospective jurors by counsel for the people and for the defendant, such examination to be conducted orally and directly by counsel." (Stats. 1974, ch. 960, § 1, p. 2000, repealed by Stats. 1988, ch. 1245, § 36, p. 4155.) Section 1078 was repealed in 1988

right of counsel to reasonable examination of prospective jurors, but also a duty upon the trial court to select an impartial jury"].) In support of his contention, he cites the trial court's failure to ask certain questions following responses given on voir dire by Deborah Wallen and Oran Pentz, each of whom ultimately sat as jurors on the jury that tried defendant's case.

### a. Deborah Wallen

Juror Deborah Wallen was involved in an incident that occurred in 1978, in which Wallen—then 21 or 22 years of age—was followed by a man while she was driving with her young son. The man flashed his lights, and Wallen drove to the side of the road. There, the man told her that if she did not open her door, he would shoot her. Wallen escaped by driving away at high speed. When the man subsequently was tried for raping another woman, Wallen testified at his trial regarding the incident in which the man had pursued her.

Defendant contends the trial court inadequately examined Wallen regarding the 1978 incident. Our review of the record, however, reveals that such examination was unnecessary in view of Wallen's notation of the incident on the juror questionnaire, and her responses to questions posed by the prosecutor and defense counsel. In his voir dire of Wallen, defense counsel thoroughly inquired as to this matter. During that inquiry, Wallen indicated that she knew little regarding the rape charge that had been filed against the man, that the 1978 incident would not bother her if she sat on the jury in the present case, and that the matter had been "a long time ago." Defense counsel refrained from challenging Wallen for cause. In light of Wallen's responses, we fail to perceive a deficiency on the part of the trial court, or defense counsel, in refraining from asking additional questions.

### b. Oran Pentz

Juror Oran Pentz indicated on his juror questionnaire that (1) his brother-in-law was employed as a policeman by the City of Costa Mesa, (2) he had followed media accounts of a different case involving the shooting of a woman married to one of his friends, and (3) he had read newspaper accounts of the Diane Harper killing.[11] Pentz discussed these matters during the voir dire examination, stating that he found the newspaper account

---

and replaced by Code of Civil Procedure section 223. In 1990, the voters enacted Proposition 115, the "Crime Victims Justice Reform Act," which repealed and reenacted Code of Civil Procedure section 223. (Stats. 1990, §§ 6, 7, pp. A-243 to A-245, eff. June 5, 1990.) Because jury selection in the present case occurred in 1987, former section 1078 applies.

[11]In response to a jury questionnaire inquiry that asked Pentz what he already knew about the present case, Pentz responded: "I cannot remember all of the details. But what I do remember is that the girls were picked up at the school and taken out to a remote area. The

"pretty much convincing," adding that he "would hope [he] wouldn't" consider the article should evidence be introduced at trial that varied from the newspaper account.

Defendant contends that the trial court failed to inquire into these "clearly prejudicial statements." Although defendant is correct that the trial court did not make such an inquiry, defendant's assertion is a misleading one, because the prosecutor and defense counsel thoroughly questioned Pentz (who eventually became the jury's foreperson) as to the matters noted. In response to defense counsel's inquiries, Pentz stated that he would use the same standard for credibility in weighing a police officer's testimony that he would use for anyone else's testimony, and that he was neither biased nor prejudiced in evaluating testimony offered by a police officer.

In response to a jury questionnaire inquiry asking Pentz whether the newspaper account led him to favor the prosecution or the defense, Pentz stated "neither," adding, "I have not heard the whole story and I do not know if the person in custody did this." On voir dire, defense counsel asked whether Pentz "could in fact listen to the facts that are presented, the evidence that is presented in this case and make your decision solely on that evidence and be fair to both sides as concerning the penalty." Pentz responded affirmatively. Defense counsel refrained from challenging Pentz for cause.

In light of Pentz's responses, we fail to perceive a deficiency on the part of the trial court in refraining from asking additional questions. (Cf. *People v. Bittaker* (1989) 48 Cal.3d 1046, 1090 [259 Cal.Rptr. 630, 774 P.2d 659] [holding that the trial court should have sustained a defense challenge for cause where a prospective juror expressed doubts regarding his own impartiality].)[12]

---

person that picked them up took one of the girls away from the vehicle to a secluded area and, as stated in the newspaper, raped and killed the girl. He then came back to the vehicle and the other girl got scared when she started questioning as to the whereabouts of her friend. She then talked real nicely to the person that picked them up and he let her go at an unknown location. I cannot remember if she was sexually attacked or not. This is the bits and pieces of the incident that I can recall at this time."

[12]Defendant also contends trial counsel provided constitutionally deficient performance in failing to conduct a more thorough voir dire examination of prospective jurors and in failing to challenge Jurors Wallen and Pentz for cause. Because our review of the record reveals that trial counsel's performance did not fall "below an objective standard of reasonableness . . . under prevailing professional norms," we reject defendant's contention. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674]; *People* v. *Musselwhite* (1998) 17 Cal.4th 1216, 1260 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

## 2. Whether the Trial Court Deprived Defendant of His Right to a Fair and Impartial Jury by Failing to Dismiss Juror Venable for Hardship

■ At the time of trial, Juror Mike Venable operated a crop-dusting business in which his income depended on seasonal work. At various points during the trial, Venable expressed to the court his concern regarding whether the proceedings would conclude in time for him to participate in the crop dusting he had planned to perform. Defendant contends that because juror Venable faced "extreme hardship," the trial court erred in failing to dismiss Venable for good cause, as permitted by section 1089, leading to an abridgment of defendant's "right to a fair trial, a fair and impartial jury, a reliable determination of guilt, due process, and fundamental fairness under the Fifth, Sixth, Eighth, and Fourteenth Amendments and their state constitutional analogues."[13] Defendant is mistaken.

Near the outset of voir dire, Venable stated that "I don't think a killing alone warrants the death penalty," and that he would be able to evaluate the case based upon the evidence presented. Shortly thereafter, defense counsel passed for cause. In response to the prosecutor's inquiry regarding why Venable could take the time to sit as a juror, Venable responded: "I'm seasonal work, my primary duty is I cropdust and we're pretty seasonal. And the summer months are the busiest months. I do have other duties, but they're very light." Venable did not claim that jury service would pose a financial hardship (as did several other prospective jurors).

Shortly after Venable was selected as a juror, on December 17, 1987, the following colloquy ensued:

"Venable: The question I have, you estimate approximately two and a half months?

"The Court: Right.

"Venable: If this thing runs in the end part of March and April that would present a—especially the month of April, will present a problem for me.

"The Court: What happens in April?

---

[13]Section 1089 provides in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors."

"Venable: That's when I make my money.

"The Court: What do you do?

"Venable: I'm a cropduster.

"The Court: Okay.

"Venable: I'm real seasonal.

"The Court: I don't think that will be a problem. If it is a problem, both counsel know about it, you've told us about it ahead of time and perhaps they can stipulate to an alternate coming in rather than excusing you [for] undue hardship.

"Venable: Okay."

On the following day, December 18, 1987, Venable contacted the court (apparently by telephone) to express his misgivings regarding jury service. A note from the court clerk read as follows: "Juror #3, Mike Venable, contacted the court and indicated the more he thought about the length of this trial and he thought it may interfere with his cropdusting. He indicated his busiest time is the last part of February and the full month of March. (This is when he makes his money). [¶] The clerk called him back and indicated 'it was too late.' He [Venable] just stated to me that we (the court) are aware of the problem with his job."

The jury reached its guilt phase verdict on February 9, 1988, and was ordered back to court on February 22, to begin the penalty phase. The following colloquy ensued on February 9:

"The Court: Hello, Mr. Venable. You gave me a note that you had a question?

"Venable: Yes, Your Honor. As twice before I've talked to you about, you know, the time schedule of this has kind of lingered on longer than I thought I would be here. I wondered if it would be a good time where maybe you could bring in an alternate in my place to finish this trial, so I could get back to work.

"The Court: All right. Let me discuss that with counsel and then get back to you. But in the meantime could you plan to be here on the 22nd of February?

"Venable: Uh-huh.

"The Court: We'll see you at that time, and I'll bring this to the attention of the attorneys. They've both heard your request."

On February 11, 1988, the trial court made the following observations to counsel:

"Mr. Venable obviously does not want to be here. And if he's going to be forced to be here, I don't know what [his] reaction [to] that would be. I can understand that he has already voted for guilt and heard the evidence and already been a part of the chemistry of this particular jury, and perhaps for that reason, the District Attorney would like to keep him.

"But the other thing that could enter into it is if he becomes upset and starts to blame the Court and the District Attorney and the defense, he might not be the best of jurors.

"I suspect that what he tells me is not good cause, from what I've heard, to release him. But, if counsel would stipulate to . . . release him I would obviously do that. But if counsel want to keep him I would not force a stipulation on you."

The prosecutor thereafter indicated his concern that if Juror Venable were excused, other jurors might submit similar requests. Accordingly, the prosecutor expressed a preference that Juror Venable remain on the jury. Defense counsel indicated that he was prepared to stipulate to Venable's excusal. Noting that Venable still had Friday through Sunday each week to perform his work, the trial court informed counsel that Venable would remain on the jury.

On February 23, 1988, just after the commencement of the penalty phase, the trial court informed counsel:

"Mr. Venable did come in and speak to me, he was very understanding and indicated that he's been able to work his schedule out so far and will continue to try to do so. [¶] . . . [¶] He also indicated on the week of March 19th, [Venable has] a contract . . . to go down to Guadalajara and spray down there. He wouldn't be available then the week of the 21st through 25th, and he wanted to bring that to both your attention and if that can be worked around he said he'd be very appreciative of that fact and that other than that he thinks he can continue being a juror. [¶] My expression to him was he should show up at 9:15 tomorrow, I would bring this to both your attention, he could explain it to both of you tomorrow and you can ask him questions about that, and that in all likelihood we'll probably at least keep

him here until he has to go to Guadalajara, we'd just see how the case progresses at that point."

On the following day, February 24, 1988, the trial court engaged Juror Venable in the following colloquy:

"The Court: We had a brief conference, discussion late Monday and you brought to my attention the fact that your father's business, that is who you work for, has an obligation the week of March 19 involving Guadalajara. I brought that to the attention of both attorneys, I thought you should explain this to them and they could ask you additional questions. You can go ahead and tell me what you told me in chambers.

"Venable: Basically we are getting down to short strokes of the early fire season in Mexico. We have three airplanes going to leave the 20th of March. Now I can sit through this thing until that point but at that point I am going to need at least a couple weeks' leave of absence if this thing is going through that. I have management duties, flying duties, and basic everyday duties I do now.

"The Court: You told me that if possible you could take care of your duties down there in one week as opposed to two weeks?

"Venable: I can be relieved, all I got to do is get equipment there, people come off other contracts and they will come down and take those seats.

"The Court: So, basically, if we tried to work our schedule around being in recess from the 21st to the 25th, which would then leave you the weekends of the 19th all the way through the 27th, that would give you enough time and you'd be able to resume again on the 28th if necessary?

"Venable: Yeah, as I sit here, yeah, but a day or two either way is kind of tough when you're down there.

"The Court: All right.

"Venable: I can safely say now the whole month of April I'll be locally available, you know. The schedule you guys kept here for these last five weeks hasn't been as strenuous as I thought it was going to be. You left me two or three days and I can go to work from 7:00 to 8:30 and get the guys working in the morning and I am back by 4:00. That's why I have been able to sit through as long as I have sat through. I thought it would be done by February 15th, but I can see we're probably going to be looking at April now, aren't we?

"The Court: When we actually went through the initial questioning we were pretty clear on telling everybody that this was going to be to the end of March.

". . . . . . . . . . . . . . . . . . . . . . . . .

"Venable: Uh, then when you specifically brought that point up that's when the first time I stood up and says, well, that is going to kind of infringe on me a little bit. You said, well, we'll work that out when we get to it.

"The Court: Okay."

Following the exchange noted above, the court asked the prosecutor and defense counsel if they had any additional questions of Juror Venable. Each replied that he did not.

Later that same day, the trial court inquired of Juror Venable whether he would be inconvenienced if the trial were conducted on Friday (normally the day in which the court addressed its other pending cases): "I know you have got a problem with your crop dusting. Do you think you can work that out, you will have two days next week to do it, otherwise—". Juror Venable replied: "At this point I'd say push it just as fast as you can get it done, for me."

On March 7, 1988, Juror Venable expressed concern to the trial court whether "it's going to be three weeks to finish this up . . . or four weeks with the week we're taking off." (The one-week recess in trial was taken in part to accommodate Juror Venable's desire to crop dust in Mexico.) The trial court replied that "[I]t may go to the week of [April] 4th, but that will be it for sure it looks like. Okay?" Juror Venable: "Okay."

"A trial court's decision whether to discharge a juror for good cause under Penal Code section 1089 is subject to review under the abuse-of-discretion standard." (*People* v. *Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153], citing *People* v. *Ashmus* (1991) 54 Cal.3d 932, 986-987 [2 Cal.Rptr.2d 112, 820 P.2d 214; *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318].) As we shall explain, the trial court did not abuse its discretion in declining to discharge Juror Venable.

The record indicates that from the time Venable was selected as a juror, he repeatedly expressed concern to the trial court regarding the possibility that his service on defendant's jury might interfere with his crop-dusting duties. Venable assured the court, however, that if a one-week recess were granted

in March to accommodate his desire to fulfill a particular crop-dusting job, he could continue serving as a juror. The court granted the recess, and Venable evidently was present in court whenever his attendance as a juror was required. There is no indication that he was unable to discharge his duties as a juror. Under these circumstances, the trial court did not abuse its discretion in declining to discharge Juror Venable.

Although it is true that Juror Venable expressed an interest that the proceedings continue apace, the record does not indicate that he lacked the "spiritual contentment and mental detachment that good jurors require," as alleged by defendant. (See *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 232 [66 S.Ct. 984, 991, 90 L.Ed. 1181, 166 A.L.R. 1412].) Nor does the record demonstrate that Venable was unable "to perform the functions of a juror." (*People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) Rather, Venable's comments suggest that he was concerned the trial might not conclude within the time period originally estimated by the trial court. In a lengthy capital trial, such concerns are not unusual; we perceive no abuse of discretion in the manner in which the trial court addressed those concerns. (See *Thiel* v. *Southern Pacific Co.*, *supra*, 328 U.S. at p. 224 [66 S.Ct. at p. 987] ["Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when financial [discomfort] is such as to impose a real burden and hardship does a valid excuse of this nature appear."].) We therefore reject defendant's contention that the trial court erred in refraining from excusing Juror Venable.

### B. *Motion to Change Venue*

Defendant contends that the trial court violated his federal and state constitutional rights to due process of law, a fair trial, and an impartial jury when it denied defendant's pretrial motion for change of venue. (U.S. Const., Amends. V, VI, XIV; Cal. Const., art. I, §§ 1, 15, 16; see also § 1033, subd. (a).) As we shall explain, the contention was waived below, but in any event, it lacked merit.

Defendant submitted his motion for change of venue prior to the selection of the jury. The trial court rejected defendant's contention that pretrial publicity likely would sway public opinion within Riverside County toward the belief that defendant was guilty of the charged offenses. The trial court therefore denied the motion without prejudice to its renewal, stating that once jury selection commenced, the court "would entertain another motion for change of venue at that time." Defendant refrained from renewing the motion.

Under very similar circumstances, this court concluded in *People* v. *Williams* (1997) 16 Cal.4th 635, 654 [66 Cal.Rptr.2d 573, 941 P.2d 752], that the defendant, by failing to renew his change of venue motion after voir dire, had failed to preserve the issue for appeal. We stated in *Williams*: "As we explained in *People* v. *Howard* (1992) 1 Cal.4th 1132, 1166 [5 Cal.Rptr.2d 268, 824 P.2d 1315], when a trial court initially denies a change of venue motion without prejudice, a defendant must renew the motion after voir dire of the jury to preserve the issue for appeal. Here, although expressly invited by the court to renew the motion after jury selection, defendant failed to do so." (16 Cal.4th at pp. 654-655; see generally, 4 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Jurisdiction and Venue, § 1889, pp. 2226-2227, and cases cited.) Accordingly, defendant has failed to preserve the claim for appeal.

Further, even if defendant properly had preserved the issue, his contention is without merit. ▮ The applicable law is settled. "A change in venue must be granted when the defendant shows a reasonable likelihood that a fair trial cannot otherwise be had. The trial court typically considers the nature and gravity of the offense, the size of the community, the status of the defendant and the victim, and the nature and extent of the publicity. On appeal, the defendant must show that denial of the venue motion was error (i.e., that it was reasonably likely a fair trial could not be had at the time the motion was made) and that the error was prejudicial (i.e., that it was reasonably likely a fair trial was not in fact had). We will sustain the court's determination of the relevant facts where supported by substantial evidence. We independently review the court's ultimate determination of the reasonable likelihood of an unfair trial." (*People* v. *Pride* (1992) 3 Cal.4th 195, 224 [10 Cal.Rptr.2d 636, 833 P.2d 643]; see also *People* v. *Howard* (1992) 1 Cal.4th 1132, 1166-1167 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 806-807 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Bean* (1988) 46 Cal.3d 919, 941-942 [251 Cal.Rptr. 467, 760 P.2d 996].)

▮ The charged offenses were serious and had attracted the attention of the media. "However, every capital case involves a serious charge. While this factor adds weight to a motion to change venue, it does not in itself require a change." (*People* v. *Howard*, *supra*, 1 Cal.4th 1132, 1167.) Accordingly, this factor is not dispositive. (*People* v. *Pride*, *supra*, 3 Cal.4th 195, 224; *People* v. *Edwards*, *supra*, 54 Cal.3d 787, 807.)

At the time of the guilt phase of the trial, which commenced in 1987, Riverside County had a population "approaching 900,000 people." This circumstance did not weigh in favor of a change of venue. (See *People* v.

*Daniels* (1991) 52 Cal.3d 815, 852 [277 Cal.Rptr. 122, 802 P.2d 906] [rejecting a motion to change venue away from Riverside County, at a time when the population was described in the trial court as "over 600,000"]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1131 [240 Cal.Rptr. 585, 742 P.2d 1306] [characterizing the size of Riverside County's population as a "neutral factor"]; see also *People* v. *Pride, supra,* 3 Cal.4th 195, 224 [rejecting a motion to change venue away from Sacramento County, observing that "the size [population in excess of 875,800] and metropolitan nature of the county weighed heavily against a change of venue"]; *People* v. *Howard, supra,* 1 Cal.4th 1132, 1167 [rejecting a motion to change venue away from Tulare County, with a population of 253,000, and observing that "most recent successful venue motions have involved communities with substantially smaller populations"].)

Neither defendant's status, nor that of his victims, suggested a basis for a change in venue. Although these individuals were residents of Riverside County, the record is devoid of evidence suggesting that any one of them had attained a level of prominence that possibly might support a motion to change venue. As defendant himself has conceded, both the murder victim and defendant "were relatively unknown citizens in the community."

The extent of the pretrial publicity generated in the present case was not unusual or extreme. Apparently, only three articles appeared in a local newspaper. Two of the articles appeared in August 1986, well over one year prior to the commencement of trial in November 1987. Two of the three articles noted that defendant had been treated as a mentally disordered sex offender for nearly three years in Patton State Hospital, located in San Bernardino, and had been released despite warnings from doctors that he was still dangerous to others. These articles also noted that defendant had pleaded innocent to the charges filed against him. The third article, which emphasized a lawsuit filed by the surviving victim against the Riverside County Sheriff's Department (stemming from the department's treatment of her in the immediate aftermath of her ordeal), was published in July 1987, four months prior to trial. Defendant also alleged below that an undisclosed number of radio broadcasts addressed the story.

The trial court found the reporting "neutral," not inflammatory, and insufficient to sway public opinion. Nothing contained within the record leads us to reach a different conclusion. The publicity described in the present case was insignificant in comparison with other cases in which a denial of a motion to change venue was upheld. (See, e.g., *People* v. *Bonin* (1988) 46 Cal.3d 659, 677 [250 Cal.Rptr. 687, 758 P.2d 1217], overruled on other grounds by *People* v. *Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72

Cal.Rptr.2d 656, 952 P.2d 673] [media coverage noted defendant's history of mental illness, his convictions of 10 counts of murder, and death sentence]; *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 938-939 [187 Cal.Rptr. 455, 654 P.2d 225] [more than 150 newspaper articles, 70 of which mentioned the defendant in the headlines].) The circumstance that the articles attached to defendant's motion to change venue were printed well before trial commenced also weighed against a change of venue. (See *People* v. *Edwards, supra,* 54 Cal.3d 787, 808; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1237 [283 Cal.Rptr. 144, 812 P.2d 163].) No evidence was submitted regarding the nature or length of the radio broadcasts.

Defendant contends that "six of the twelve jurors who eventually sat on [his] jury," in addition to two of the four alternates, stated during voir dire that they had heard something about the case through media reports. He asserts that the jurors' recollections demonstrate "the pervasiveness, extent, and adverse impact of the media coverage," thereby presenting "undeniable proof that the jury pool could not be impartial." Defendant is mistaken. Six *prospective* jurors expressed knowledge of the case; of these, three were excused prior to the commencement of the trial. Our own review of the responses furnished by the three remaining prospective jurors who actually sat on defendant's jury reflects only a slight level of awareness. Although these individuals expressed a general familiarity with the crimes, none recalled seeing or hearing any reports regarding defendant. Moreover, the jurors stated that they could set aside anything they previously had heard or seen in the media in favor of the evidence presented at trial. None of the alternate jurors were empaneled as jurors, and thus they did not participate in the jury's deliberations.

In view of the foregoing, it is clear that defendant has not established error or prejudice in the denial of his motion for change of venue. (See *People* v. *Daniels, supra,* 52 Cal.3d 815, 853-854 [upholding denial of motion for change of venue away from Riverside County, even though eight of twelve jurors were exposed to pretrial news coverage, and where defendant had failed to exhaust his available peremptory challenges].)

## II. *Guilt Phase Issues*

### A. *Alleged Marsden Error*

At the guilt phase of the trial, defendant made three motions to relieve his appointed counsel, pursuant to *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*). These motions were heard on September 28, 1987, October 30, 1987, and February 4, 1988. At each one of

these hearings (conducted outside the jury's presence), the trial court afforded defendant an opportunity to enumerate his concerns. Defendant did so, on each occasion failing to persuade the trial court that denial of his request to substitute counsel would substantially impair his constitutional right to the assistance of counsel. (See *People* v. *Ortiz* (1990) 51 Cal.3d 975, 980, fn. 1 [275 Cal.Rptr. 191, 800 P.2d 547].) The trial court therefore denied defendant's motions.

 Defendant contends that the trial court prejudicially erred in denying his *Marsden* motions. Before examining the governing legal principles in this area, we review the factual bases for defendant's claims.

### 1. *The September 28, 1987, Hearing*

At the first *Marsden* hearing, defendant contended that: (1) he had not seen trial counsel for approximately seven and one-half months, despite numerous requests, and counsel had failed to keep appointments with defendant on nine occasions; (2) defense investigators had not visited him with sufficient frequency and seemed unfamiliar with certain evidence that interested defendant; (3) he gave a defense investigator questions for trial counsel three months earlier and had not received a reply; (4) he told investigators he was "mad," leading trial counsel to inform him that "he [counsel] didn't care how I felt"; (5) "No one was ever interviewed on my case"; and (6) trial counsel "hasn't discussed anything with me."

Trial counsel informed the court that he had announced his readiness to go to trial on April 24, 1987, but that the trial did not proceed on that date in deference to the request of cocounsel, who was preparing for the possibility of a penalty phase trial in this case and had requested a continuance. Trial counsel explained to the court that the necessary interviews had been conducted and the forensic evidence "has all been reviewed heavily and thoroughly." Counsel added that defendant was free to call him collect at any time. Counsel believed that, in view of the readiness of the defense case, additional visits would not have been a productive use of time, and he did not believe the attorney-client relationship with defendant had deteriorated.

After hearing defendant's concerns, the trial court found that the nature of the relationship between defendant and his trial counsel had not reduced the likelihood that defendant would receive a fair trial or the effective assistance of counsel. The court concluded there had not been a deterioration of the attorney-client relationship sufficient to warrant granting defendant's *Marsden* motion to relieve counsel.

### 2. *The October 30, 1987, Hearing*

At the second *Marsden* hearing, defendant contended that: (1) trial counsel had performed an inadequate investigation, including a failure to interview

witnesses; (2) trial counsel had not kept defendant adequately apprised of the progress of the case (for example, failing to permit defendant to read the police reports); and (3) trial counsel was "very intimidating" and had caused defendant to lose confidence in him.

Trial counsel explained to the court that the pertinent witnesses had appeared at the preliminary hearing, so the defense knew the nature of their potential testimony at trial. He noted that the key prosecution witness—the surviving victim, Amy—refused to consent to an interview. He stated the rest of the case hinged on forensic evidence, and "we have hired a forensic expert that has gone over totally and completely and very thoroughly the forensic evidence . . . to be presented against Mr. Hart." Trial counsel stated that he had reviewed with defendant the evidence noted in the police reports. Counsel made the tactical decision not to provide defendant copies of the police reports, themselves, based on a concern that if read by another inmate, the reports might lead that other inmate to testify falsely against defendant. He believed defendant's "biggest complaint was that he was lonesome . . . ."

In denying defendant's motion, the trial court informed defendant that counsel had more experience in capital cases than any other attorney in the county, adding: "I find that the attorney-client relationship has not really broken down and that if there is a problem here, that problem is really a misplaced [one] . . . ." The court also observed: "Because it's a difficult case does not mean that your attorney is not concerned and not working for you."

### 3. *The February 4, 1988, Hearing*

At the third *Marsden* hearing (conducted after the parties had rested their guilt phase cases), defendant contended that: (1) trial counsel was remiss in not challenging the lineup in which the surviving victim identified him (even though defendant acknowledged "we're not disputing the fact I was up there [at the crime scene]"); and (2) trial counsel failed to impeach the victim regarding certain aspects of her testimony, or to call witnesses who would have done so.

Trial counsel explained that the issues of concern to defendant had been considered and investigated and would be noted in his closing argument to the jury, which he had discussed with defendant. Trial counsel indicated that he had rejected defendant's suggestion to present a defense based on his cocaine usage, noting that such a defense would not be applicable in this case (because the prosecution's theory of the case was that the murder was

committed in the course of a rape, thereby obviating the need for the prosecution to prove premeditation or deliberation). Counsel acknowledged that defendant had expressed an interest in testifying at the guilt phase; in counsel's view, "under no circumstances could a competent attorney allow Mr. Hart to get on the stand during this phase of the trial and allow him to be cross-examined by the prosecution when . . . we are doing our best to keep from [being placed] in front of the jury the factors in aggravation which have already been filed."

The trial court denied defendant's *Marsden* motion. In so doing, the court observed: "For the record . . . the investigation is perhaps even more extensive than I had anticipated and I anticipated even an extensive investigation, so from what I've heard here, everything brought up, you have already looked to, Mr. Barnett, so I commend you on that."

### 4. *Analysis*

The governing legal principles are well settled. " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' (*People* v. *Crandell* (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423]; see also *People* v. *Marsden* (1970) 2 Cal.3d 118, 124-125 [84 Cal.Rptr. 156, 465 P.2d 44].)" (*People* v. *Fierro* (1991) 1 Cal.4th 173, 204 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) "[S]ubstitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." (*People* v. *Webster* (1991) 54 Cal.3d 411, 435 [285 Cal.Rptr. 31, 814 P.2d 1273], citing *Marsden, supra*, 2 Cal.3d. 118, 123; see also *Bland* v. *California Dept. of Corrections* (9th Cir. 1994) 20 F.3d 1469, 1475 [trial court's refusal to substitute counsel is reviewed for abuse of discretion; denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel].)

At each one of three *Marsden* hearings conducted in the present case, the trial court provided defendant with an opportunity to set forth his complaints regarding the assistance he was receiving from appointed counsel. The trial court also invited comment from defendant's trial counsel, who

indicated on each occasion that he had investigated the case thoroughly and was aware of defendant's concerns. Although counsel did not share defendant's view as to the significance of the matters that defendant cited, counsel never wavered from his belief that defendant could benefit from his representation and that the attorney-client relationship had not deteriorated to a degree that would warrant substitution of counsel. The trial court concluded that counsel's representation of defendant neither was inadequate nor marked by irreconcilable conflict.

The record amply supports each one of the trial court's rulings denying defendant's *Marsden* motions. At the first hearing, the trial court reasonably concluded that trial counsel was prepared for trial and therefore did not need to visit defendant on a regular basis. "[T]he number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence." (*People* v. *Silva* (1988) 45 Cal.3d 604, 622 [247 Cal.Rptr. 573, 754 P.2d 1070].) At the second hearing, the trial court reasonably concluded that trial counsel's decision not to provide defendant with copies of the police reports was a tactical decision made in defendant's best interests. (See *People* v. *Crandell* (1988) 46 Cal.3d 833, 859-860 [251 Cal.Rptr. 227, 760 P.2d 423] ["A disagreement concerning tactics is . . . insufficient to compel the discharge of appointed counsel, unless it signals a complete breakdown in the attorney-client relationship."].) At the third hearing, the trial court recognized the tactical bases for trial counsel to refrain from challenging the testimony of victim Amy R. regarding minor details of her testimony, and reiterated the view that trial counsel's investigation had been more than adequate.

In sum, the record is clear that the trial court provided defendant with repeated opportunities to voice his concerns, and upon considering those concerns reasonably found them to be insufficient to warrant relieving trial counsel. We therefore find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel. (*People* v. *Fierro, supra,* 1 Cal.4th 173, 206-207; *People* v. *Silva, supra,* 45 Cal.3d 604, 622.)

### B. *The Trial Court's Exclusion of Evidence of Amy's Civil Suit*

Amy filed a civil suit alleging that the Riverside County Sheriff's Department mistreated her and lied to her at the time she reported the murder of her friend, Diane. Prior to commencement of the parties' opening statements (at a hearing conducted outside the jury's presence pursuant to Evidence Code section 402), the trial court ruled that the allegations set forth in the civil suit would be inadmissible as character evidence against sheriff's department

officials, but might be admissible as impeachment evidence if discrepancies appeared in the testimony offered at trial by Amy and the officials.

During trial, defendant's counsel requested a second hearing on this issue outside the jury's presence. At that hearing, counsel contended that evidence pertaining to Amy's civil suit was "relevant in that it might be motivation for Amy to make a stronger statement for herself, and for the officers to make a protective statement for themselves." The prosecutor contended that evidence of Amy's civil suit was irrelevant and, even if it were relevant, should be excluded pursuant to Evidence Code section 352.[14] In support of his argument, the prosecutor observed that "90 percent of the investigative reports prepared by the detectives in this case or—who are the subjects of the civil lawsuit, were prepared at sometime prior to the lawsuit even being filed."

The trial court found: "Th[is] court's confident that within the meaning of Evidence Code section 352, whatever probative value that evidence would have, and I can't think of very much, is substantially outweighed by the probability that it . . . will first of all necessitate undue consumption of time and will create a substantial danger, undue prejudice, of confusing the issues, and of misleading the jurors. [¶] I think that what goes into filing a lawsuit [—] that motivation is really impossible for us to know, and what [e]ffect that lawsuit has on people testifying, especially when there are written police reports, especially when there are statements made before a lawsuit was even conceived as a possible way to go. [¶] It strikes me that there's just not probative value to that. So, for those reasons, the court will exclude that evidence."

On appeal, defendant contends the trial court prejudicially erred in excluding evidence of Amy's civil suit. In defendant's view, evidence of that lawsuit provided a "relevant basis upon which to attack [Amy's] credibility." (Evid Code, § 780.)[15] Defendant contends that he was entitled to expose the biases or motives to lie that may have been held by the witnesses who testified against him, and that the trial court's ruling infringed upon his rights to a fair trial, to counsel, to confront the witnesses against him, to due process of law, and to a reliable verdict under the United States and California Constitutions.

Defendant's position regarding the probative value of evidence concerning Amy's civil suit has evolved during this litigation. At trial, defendant sought

[14]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[15]Evidence Code section 780 provides in pertinent part: "[T]he court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove

to introduce the evidence to highlight the character of sheriff's department officers and, subsequently, to impeach their testimony and that of Amy. On appeal, however, defendant contends, among other things, that the evidence would have informed the jury that the "Sheriff's Department itself suspected [Amy] of involvement in the murder of Diane Harper." To the extent that defendant's assertion of evidentiary error rests upon a theory of admissibility not presented to the trial court, we conclude that defendant has waived this claim.

In any event, defendant's contentions do not withstand scrutiny. Assuming, without deciding, that evidence of Amy's civil suit satisfied the definition of relevancy set forth in Evidence Code section 210,[16] we conclude that the trial court did not abuse its discretion in excluding the proffered evidence pursuant to Evidence Code section 352. In basing its ruling upon the principles set forth in the latter statute, the trial court accepted defendant's contention—at least, for purposes of argument—that the proffered evidence had some relevance. As noted, the trial court thereafter concluded that Amy's civil suit had only minimal probative value, and that such value was substantially outweighed by the probability that presentation of the evidence would require the undue consumption of time and would create a substantial risk of confusing the issues and misleading the jurors.

The trial court did not abuse its discretion. ■ "When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers 'substantially outweigh' probative value, the objection must be overruled. (See *People* v. *Babbit* (1988) 45 Cal.3d 660, 688 [248 Cal.Rptr. 69, 755 P.2d 253].) On appeal, the ruling is reviewed for abuse of discretion. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 973 [2 Cal.Rptr.2d 112, 820 P.2d 214].)" (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

■ Here, the trial court properly could conclude the circumstance that Amy filed a civil suit against the Riverside County Sheriff's Department was

---

or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following:

" . . . . . . . . . . . . . . . . . .

"(b) The character of his testimony.

" . . . . . . . . . . . . . . . . . .

"(e) His character for honesty or veracity or their opposites.

"(f) The existence or nonexistence of a bias, interest, or other motive."

[16]"Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People* v. *Garceau, supra,* 6 Cal.4th 140, 177.)

of attenuated significance to the issues contested at trial, particularly inasmuch as the observations of sheriff's deputies that were material to the present case were set forth to a great extent in reports prepared well before Amy filed her civil suit, and because the deputies' observations and recollections could be tested on cross-examination on the basis of those reports. Further, the trial court properly could determine that the admission of evidence of Amy's civil suit would have permitted the focus of the testimony to shift away from the events leading to and involving the charged offenses, to the conduct of law enforcement officers *after* those offenses had been committed. The trial court acted within its discretion in determining that such a shift presented a substantial risk of confusing or misleading the jury.

Nor do we find any constitutional infirmity in the trial court's ruling. The court merely exercised its discretionary power to preclude examination on collateral matters. (See *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431, 1435, 89 L.Ed.2d 674].)

Finally, even if we were to assume that the trial court erred in excluding this evidence, reversal would not be warranted. Defendant's involvement in the murder of Diane Harper and the sexual assault of Amy was firmly established. His defense focused upon the nature of the sexual misconduct committed at the crime scene. Hence, under any prejudicial error standard, the asserted error was harmless. (See *Chapman* v. *California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1125 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## C. *Sufficiency of the Evidence*

Defendant contends that "while it was clear that [he] was with the [victims on the day the crimes were committed], and had been at the murder scene," the evidence presented at his trial was insufficient to establish his guilt beyond a reasonable doubt of the first degree murder of Diane with special circumstances, and of the sexual offenses committed against Amy.

In addressing defendant's contention, we apply well settled law. " ' "In reviewing the sufficiency of evidence for a special circumstance"—as for a conviction—"the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." ' (*People* v. *Rowland* [(1992)] 4 Cal.4th [238,] 271 [286 Cal.Rptr. 801, 818 P.2d 84], quoting *People* v. *Mickey* [(1991)] 54 Cal.3d

[612,] 678 [14 Cal.Rptr.2d 377, 841 P.2d 897], italics in original.)" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1090 [25 Cal.Rptr.2d 867, 864 P.2d 40], fn. omitted, overruled on other grounds, *People v. Hill, supra,* 17 Cal.4th 800, 823, fn. 1.) ▮▮▮ As we shall explain, in view of the standard set forth in the decisions cited above, defendant's contention is without merit.

### 1. *The First Degree Murder of Diane*

The prosecution tried the case under a theory that the murder of Diane either was premeditated or was perpetrated during the commission of a rape or attempted rape. Defendant's claim of insufficiency of the evidence thus relates to the issues of intent to kill, the underlying felony of rape, and an independent felonious purpose on his part. (See *People v. Berryman, supra,* 6 Cal.4th 1048, 1090.) Defendant also challenges the sufficiency of the evidence that he committed the murderous act.

The evidence of defendant's culpability in the charged offenses, noted below, makes clear that a rational trier of fact could have found that defendant, having committed or attempted a sexual assault upon Diane, thereafter killed her, and that both the prosecution's premeditation *and* felony-murder theories were established beyond a reasonable doubt.

▮▮▮ Our decision in *People v. Berryman, supra,* 6 Cal.4th 1048, summarized the principles that guide our analysis of defendant's contentions relating to the first degree murder of Diane: " 'Murder is the unlawful killing of a human being . . . with malice aforethought.' (. . . § 187, subd. (a).) [¶] As pertinent here, '[a]ll murder which is perpetrated . . . by any . . . kind of willful, deliberate, and premeditated killing . . . is murder of the first degree . . . .' (. . . § 189.) The mental state required is, of course, a deliberate and premeditated intent to kill with malice aforethought. (See . . . §§ 187, subd. (a), 189.) [¶] Similarly, '[a]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate,' certain enumerated felonies, including rape, 'is murder of the first degree . . . .' (. . . § 189.) The mental state required is simply the specific intent to commit the underlying felony; neither intent to kill, deliberation, premeditation, nor malice aforethought is needed. (See . . . *People v. Coefield* (1951) 37 Cal.2d 865, 868-869 [236 P.2d 570]; see, generally, 1 Witkin & Epstein, Cal. Criminal Law [(2d ed. 1988)], Crimes Against the Person, § 470, p. 528; see also *People v. Hernandez* (1988) 47 Cal.3d 315, 346 [253 Cal.Rptr. 199, 763 P.2d 1289] [stating that '[w]e have required as part of the felony-murder doctrine that the jury find the perpetrator had the specific intent to commit one of the enumerated felonies, even where that felony is a crime such as rape'].) There is no requirement of a strict 'causal' (e.g., *People v. Ainsworth* (1988) 45

Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017]) or 'temporal' (e.g., *People* v. *Hernandez, supra,* 47 Cal.3d at p. 348) relationship between the 'felony' and the 'murder.' All that is demanded is that the two 'are parts of one continuous transaction.' (E.g., *People* v. *Ainsworth, supra,* 45 Cal.3d at p. 1016; see, e.g., *People* v. *Hernandez, supra,* 47 Cal.3d at p. 348.) There is, however, a requirement of proof beyond a reasonable doubt of the underlying felony. (See, e.g., *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783].)" (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1085.)

A rational trier of fact readily could have determined beyond a reasonable doubt that defendant acted with premeditation and deliberation in intentionally killing Diane. Dr. Dewitt Hunter, the Riverside County pathologist who performed the autopsy on the victim, testified that at least five distinct blows—each one of which was capable of rendering the victim unconscious—were exerted against the back of the victim's head, probably with the use of a rock or a brick-like instrument. The victim's skull was fractured, a circumstance that required "a large amount of force." Her head was driven six inches into the ground. Beside her was a shoe impression that matched one of defendant's shoes, as well as a beer bottle that matched the beer that the trio had purchased earlier that day. Amy testified that defendant declared to her: "[L]ook, you're friend was an asshole, she called me a few names, and I think she's dead." The nature and severity of Diane's wounds, together with defendant's own statements, support a finding that defendant willfully and with premeditation murdered her. (See *People* v. *Mincey* (1992) 2 Cal.4th 408, 433 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 270 [221 Cal.Rptr. 794, 710 P.2d 861]; see also *People* v. *Pride, supra,* 3 Cal.4th 195, 247 [the jury could conclude that the defendant killed his victim "to silence her as a possible witness to her own sexual assault"].)[17]

Similarly, a rational trier of fact could have determined with the requisite degree of certainty that defendant murdered Diane while he was engaged in raping her or attempting to rape her. Her partially clothed body (naked from the waist down, with panties wrapped around one leg), the evidence of force

---

[17]In his opening brief on appeal, defendant asserts: "The physical evidence showing Diane Harper's blood splattered on Amy['s] blouse suggests that Amy . . . was not an innocent bystander, and that she possibly had a part in the killing herself." To the extent that defendant seeks reversal of his first degree murder conviction based upon questions regarding Amy's credibility or questions regarding who inflicted the fatal blows upon Diane, we reject the claim. In view of the other evidence indicating that defendant acted alone in committing the crimes, his suggestion that Amy may have been a participant in the brutal murder of her friend lacks credibility, and certainly does not support a claim that the evidence at trial was insufficient to support the jury's determination that defendant killed Diane.

and violence including abrasions and contusions on the victim's thighs, the presence of a foreign pubic hair on her thigh, the reddening of her vaginal area, and the discovery of a Vaseline-like substance near her vaginal entrance (the same substance defendant used in his rape of Amy), support the reasonable inference that a rape or attempted rape occurred. (*People* v. *Wright* (1990) 52 Cal.3d 367, 405 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Morales* (1989) 48 Cal.3d 527, 553 [257 Cal.Rptr. 64, 770 P.2d 244].) Amy testified that when defendant attempted to sodomize her, and had difficulty obtaining an erection, he informed her: "[I]t's hard for me to get it up after I just got it on with your friend."

In view of the evidence presented, a rational trier of fact reasonably could have found that defendant committed the first degree murder of Diane while engaged in the course of a rape or attempted rape.

### 2. The Rape and Sodomy Special Circumstances

Defendant contends there was insufficient evidence in support of the special circumstances involving rape and sodomy. He specifically challenges the sufficiency of the evidence as it pertained to whether "penetration" had occurred, whether Diane was alive when the crimes of rape and sodomy allegedly were committed, and whether the rape and sodomy were part of a "continuous transaction" with the murder. None of defendant's challenges have merit.

The prosecution's pathologist testified there was no physical evidence of forcible sexual entry into Diane's vaginal or anal orifices. Defendant seizes upon the absence of physical evidence of penetration to assert the insufficiency of the evidence in support of the special circumstances of rape and sodomy. The pathologist's testimony, however, did not suggest that penetration could not have occurred, and the jury reasonably could have found from the other evidence reviewed above, including defendant's statement to Amy, that a completed rape and sodomy had occurred.

Furthermore, the prosecution was not required to establish the completion of the underlying felonies in order to establish the special circumstances. Either of the respective special circumstances at issue may be found true if the murder was committed while defendant was engaged in the commission *or attempted commission* of rape or sodomy. (§ 190.2, subd. (a)(17)(C), (D); *People* v. *Wright, supra,* 52 Cal.3d 367, 405.) As noted above, there was overwhelming evidence to support a finding that defendant had sexually assaulted Diane and at least had *attempted* to rape and sodomize her, and that the murder occurred during the commission of these offenses.

Defendant contends there was insufficient evidence that the murder occurred during the commission of, or attempted commission of, or in flight immediately following the commission of, rape or sodomy. The evidence, however, supported a finding that Diane resisted defendant's assault, called him "some names," was sexually attacked, and thereafter was killed. The prosecution's pathologist opined that there had been at least an attempt to sexually assault Diane prior to her death. According to the testimony given by Amy, defendant explained that his impotence was related to having just "got it on" with the murder victim. The evidence supports a finding that the murder occurred during, or immediately after, the commission or attempted commission of, the underlying felonies of rape and sodomy of Diane.

Defendant also challenges the adequacy of the evidence in support of the special circumstances, contending that the prosecution failed to establish that Diane was alive when the crimes of rape and sodomy allegedly were committed. The evidence, however, refutes defendant's position; contusions on Diane's thighs and reddening of her vaginal area were consistent with a forcible sexual assault, and defendant's statements to Amy that Diane called him "a few names," and "I just got it on with your friend," indicate that Diane had attempted to resist defendant's attack and that defendant had committed or attempted to commit rape and sodomy while Diane still was alive. Thus, the jury reasonably could conclude that Diane was alive during defendant's sexual attack upon her.

Moreover, when an individual attempts to rape (or sodomize) a victim, reasonably or mistakenly believing that the victim is alive, the perpetrator is guilty of having attempted the underlying felony. (See *People* v. *Thompson* (1993) 12 Cal.App.4th 195, 203 [15 Cal.Rptr.2d 333]; see also *People* v. *Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385] ["it . . . does not matter whether actual penetration did not occur until after death for purposes of the special circumstance"]; *People* v. *Guzman* (1988) 45 Cal.3d 915, 949-952 [248 Cal.Rptr. 467, 755 P.2d 917] [explaining the scope of the rape special circumstance].)

Accordingly, we reject defendant's claim that the evidence was insufficient to support the rape and sodomy special circumstances.

3. *The Sexual Offenses Committed Against Amy*

Defendant contends that the evidence relating to the sexual offenses committed against Amy was insufficient. In fact, however, the evidence was abundant. Amy's own testimony, which provided graphic detail of the attack, would have been sufficient by itself. That testimony was corroborated

by physical evidence: seminal fluid was found on Amy's slip, bruises and abrasions were found on her body, her perineum was injured and there was much sand in this area, and sand-type particles also were found inside her vagina. In addition to the emergency room physician's testimony voicing the opinion that Amy had been sexually assaulted, and Amy's own testimony to the same effect, the physical evidence clearly was sufficient to support defendant's conviction of the sexual offenses committed against her.[18]

### D. *Admission of Photographs*

#### 1. *Overview*

Defendant contends that the admission of sixteen photographic slides, three photographs, and one videotape prepared by investigators, depicting the route to the crime scene, was unduly cumulative and prejudicial and demonstrated a clear abuse of discretion. He further alleges that the admission of this evidence violated his constitutional rights to due process of law, a fair trial, and a fair and reliable determination of guilt and penalty. (See U.S. Const., 5th, 6th, 8th, and 14th Amends.)

As we shall explain, defendant's failure at trial to interpose a timely objection to the photographic evidence constitutes a waiver of the present challenge. Further, even if defendant timely had objected, the trial court clearly would have acted within its discretion in admitting the evidence he challenges on appeal.

The 16 slides depict Diane's body as follows: Six slides show the body, partially clothed, lying facedown at the crime scene. Two other slides show the victim's feet, lying upon shopping bags, and a third slide shows the shopping bags only. Another slide shows the victim's feet, with her underwear nearby. One slide shows her hip. One slide shows the bloodied rear of

---

[18]Because we conclude that the evidence at trial was sufficient to support the jury's determination of guilt and its finding that the special circumstance allegations were true, we summarily reject defendant's contention that the insufficiency of the evidence violated his rights to a fair trial, reliable guilt and penalty phase determinations, due process of law, and fundamental fairness under the Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments of the United States Constitution. (See *People* v. *Berryman, supra,* 6 Cal.4th 1048, 1086 [rejecting constitutional claims on the basis that the evidence was not insufficient]; *People* v. *Rowland* (1992) 4 Cal.4th 238, 270, fn. 8 [14 Cal.Rptr.2d 377, 841 P.2d 897] [same].)

We also reject defendant's contention that, in failing to challenge certain inconsistencies contained in the testimony of the surviving victim, the performance of his trial counsel violated his constitutional rights "to a fair trial, . . . to confront and cross-examine witnesses against him, a reliable determination of guilt, and due process, and fundamental fairness." Defense counsel's decision not to challenge the surviving victim's testimony regarding her ordeal clearly could have rested upon sound trial tactics. Our review of the record reveals no constitutional deficiency in trial counsel's performance. (*People* v. *Rowland, supra,* 4 Cal.4th 238, 274, fn. 15; see also pt. II.H., *post.*)

her skull. One slide shows blood on debris nearby. Three slides show the body after investigators had rolled it over, including one close-up of the victim's face.

The three photographs (eight inches by ten inches in size) representing prints of photographic slides, depict the following: one photograph shows the victim's body lying facedown, partially clothed; a second shows a beer bottle and a depression in the ground, and the third photograph is an autopsy photograph depicting the victim's mouth, trachea, and larynx, showing debris.

As noted, the videotape shows the route to the crime scene. It was made by investigators on April 15, 1986, approximately three weeks after the crimes were committed. A portion of the videotape was taken from a passenger vehicle, and the balance was made while the cameraman walked along a dirt footpath, as marked by sheriff's yellow tape, to the crime scene. The tape includes minimal discernible sound, other than the cameraman's footsteps and breathing.

## 2. *Introduction of the Evidence*

Prior to the giving of opening statements, the following colloquy ensued between the attorneys and the court (outside the jury's presence), regarding the photographic slides.

Defense counsel: "Your Honor, the first matter I think we should cover is that [the deputy district attorney] intends to use some slides during his opening presentation Monday, his opening statement. I went to his office yesterday, and spent, I guess, an hour and a half going over the slides, et cetera, with [him] and even seeing them—I mean not just going over them. I saw them projected on the wall, et cetera, et cetera. I find there is no slide there that I could object to."

The court: "In terms of being outrageously gross?"

Defense counsel: "That's right. Under [Evidence Code section] 352, I could not say that they were more hurtful than beneficial to him or anything else. They portray factual reality. Some of them may not be what I would like to see, but I want to go on the record that I can't raise a single objection, and I would not if we were here and he was having to show them against the wall today."

The court: "I take it we don't have any autopsy picture where the body is cut open or anything like that."

Defense counsel: "No. The only picture we have—I mean—there is a picture of the body, of the deceased girl at the scene in about two or three positions, but one is as she was found, one as she is turned over, and one a little closer. There are footprint, tire print, pathway [slides]."

The court: "Immediately near the body?"

Defense counsel: "Yes."

The court: "Okay. I agree with you then. I would in all likelihood—"

Defense counsel: "In fact, I would say having seen a ton of pictures, these are as little inflammatory as possible to get the opening statement made."

The court: "All right."

Defense counsel: "So I cannot object about those, so I want that on the record so that when we start tomorrow, we'll understand. [¶] As we proceed, there may be a time when we have to have a brief [Evidence Code section] 402 hearing on other pictures, but as of this point, that's fine."

The court: "All right. . . . [¶] I might indicate for the record that I was advised that there was the intention—it was the intention of the District Attorney to use slides, and it seems to me the law is quite clear that slides can be used as part of an opening statement to illustrate the testimony. . . . [I]t's been my experience in this county that slides have been used on numerous occasions and other counties almost without exception at this point in time."

Defense counsel: "Yes, Your Honor. These are slides—this is a portrayal that the jury would see all of that in the form of introduced evidence."

The court: "All right."

Defense counsel: "So there is no objection as to the slide show that we will be subjected to Monday morning on the 11th."

The prosecutor thereafter displayed the slides during his opening statement. The defense did not lodge an objection. During the prosecution's case-in-chief, the slides were shown in the course of the testimony given by Riverside County Detective Michael Lackie. Again, the defense did not lodge an objection. When the prosecutor subsequently moved that the slides be introduced into evidence, defense counsel interjected: "Well, I object to all of them but I don't have any grounds for them, so let them have their slide show."

During Detective Lackie's testimony, the prosecutor offered to play the videotape, showing the route to the crime scene. The court asked defense counsel if he had any objection. Defense counsel responded in the negative, leading to the following colloquy.

The court: "Have you had a chance to review [the videotape]?"

Defense counsel: "No, but we have talked about it, [the prosecutor] and I, and it's just a—"

The court: "Demonstrative evidence?"

The prosecutor: "Yes, and the defense has been provided a copy of this video previously."

Defense counsel: "We talked about it, it's fine."

The prosecutor thereafter played the videotape for the jury, while asking Detective Lackie certain questions regarding the scenes shown on the tape. The court admonished the jury that the infrequent bits of dialogue heard on the videotape—primarily, instructions to the cameraman—were not admitted for any evidentiary purpose and should be disregarded.

### 3. *Analysis*

 As noted, defendant challenges the trial court's rulings that permitted the introduction of the photographic evidence. Because defendant failed to interpose an objection that set forth the specific grounds for the objection, the issue may not be raised for the first time on appeal. (Evid. Code, § 353, subd. (a); *People* v. *Zapien* (1993) 4 Cal.4th 929, 979-980 [17 Cal.Rptr.2d 122, 846 P.2d 704]; see also *People* v. *Morris, supra,* 53 Cal.3d 152, 187-188 [explaining the purpose of the requirement]; *People* v. *Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330] [rejecting the defendant's constitutional claims based upon his failure to set forth a sufficient constitutional objection when the evidence was introduced].)

Even if defendant's challenge had been preserved, we find no error in the trial court's rulings admitting the photographic evidence. " 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' (*People* v. *Crittenden*

[(1994)] 9 Cal.4th [83,] 133-134 [36 Cal.Rptr.2d 474, 885 P.2d 887].)" (*People* v. *Scheid* (1997) 16 Cal.4th 1, 18 [65 Cal.Rptr.2d 348, 939 P.2d 748].)

 The photographic evidence corroborated the testimony given by prosecution witnesses regarding evidence found at the crime scene and events that transpired on the day the crimes were committed. Specifically, the challenged slides depict the remote area in which Diane's body was found and her partially clothed body (supporting the prosecution's theory that defendant sexually assaulted her), certain grievous wounds she suffered (probative of the issues of intent and malice), and evidence that linked defendant to the crime scene (corroborating Amy's testimony). The photographic evidence "clearly was probative of the planning and deliberation" with which the crimes were committed. (*People* v. *Scheid, supra,* 16 Cal.4th 1, 18; see also *People* v. *Crittenden* (1994) 9 Cal.4th 83, 134 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Garceau, supra,* 6 Cal.4th 140, 180-182.)

Insofar as defendant is contending that the trial court was required to exclude some or all of the photographic evidence under Evidence Code section 352, because such evidence was cumulative of the testimonial evidence presented, the contention lacks merit. (See *People* v. *Scheid, supra,* 16 Cal.4th 1, 19, and cases cited therein.) To the extent defendant is contending that the photographic evidence was unduly cumulative to other physical evidence or cumulative in and of itself, we reject that theory as well. (See *People* v. *Thompson* (1988) 45 Cal.3d 86, 115 [246 Cal.Rptr. 245, 753 P.2d 37] ["Even somewhat cumulative photographic evidence may be admitted if relevant."].) The amount of photographic evidence admitted was not excessive, in view of the particular facts of the case. Further, the record reflects that each of the challenged slides had probative value, as did the videotape.

 With regard to the issue whether the photographic evidence had a prejudicial effect, " '[w]e have described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.] As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. [Citation.]' [Citations.]" (*People* v. *Scheid, supra,* 16 Cal.4th at p. 19.)

Our independent review of the photographic evidence introduced at the trial convinces us that, although a few of the slides and photographs are unpleasant, none is unduly gory or inflammatory. As aptly observed by defense counsel at the pretrial hearing, the photographic evidence "portray[s]

factual reality. . . . I would say having seen a ton of pictures, these are as little inflammatory as possible to get the opening statement made. . . ." The photographic evidence clearly is not unduly gruesome relative to the evidence admitted in other cases involving murder victims. (See *People* v. *Scheid, supra,* 16 Cal.4th 1, 19 [upholding admission of photograph of bloodied gunshot victims, handcuffed together]; *People* v. *Garceau, supra,* 6 Cal.4th 140, 180-182 [upholding admission of photograph of mummified bodies following exhumation]; *People* v. *Raley* (1992) 2 Cal.4th 870, 897 [8 Cal.Rptr.2d 678, 830 P.2d 712] [upholding admission of large photographs of murder victim and her girlfriend found in a ravine]; *People* v. *Thompson, supra,* 45 Cal.3d 86, 115-116 [upholding admission of photographs of victim's head and ear, through which fatal stab wound was inflicted].) Of the sixteen slides challenged here, only one slide shows Diane's face, and two others show the front of her body. The other slides show the victim facedown, or not at all. Among the three challenged photographs is one of the victim lying facedown at the crime scene, and one autopsy photograph of her mouth, trachea, and larynx, showing debris. These photographs have probative value and are unlikely to have provoked an inflammatory response among the jurors. Nor is there anything revealed in the videotape that could be construed as unduly gruesome or inflammatory.

In sum, we find that the trial court reasonably could determine that the probative value of the photographic evidence outweighed its potentially prejudicial effect. We thus conclude that the trial court did not abuse its discretion under Evidence Code section 352 in admitting the photographic evidence. (See *People* v. *Scheid, supra,* 16 Cal.4th 1, 20, and cases cited therein.)[19]

### E. *Prosecutorial Misconduct*

 Defendant contends that the prosecutor engaged in misconduct by informing the jury on nine occasions that he (the prosecutor) personally had been involved in critical aspects of the investigation, including visits to the crime scene and the subsequent autopsy of Diane. Defendant asserts that such references were calculated to influence the jury improperly by casting the prosecutor in the role of "unsworn witness." (See, e.g., *U.S.* v. *Edwards* (9th Cir. 1998) 154 F.3d 915, 921.)

---

[19]We reject defendant's constitutional claims based upon his failure at trial to object on the basis of any federal constitutional provision, thereby waiving such claims. (See *People* v. *Crittenden, supra,* 9 Cal.4th 83, 135, fn. 10, and cases cited therein.) Even if the claims had been made in the trial court, we would find no constitutional error, in view of our determination that the photographic evidence properly was admitted into evidence. (*Ibid.*)

The challenged comments were made at various stages of defendant's trial, and are set forth in the margin.[20] As defendant acknowledges, none of

---

[20]1. During his opening statement, the prosecutor described the crime scene on the morning it was discovered, as follows:

"They [the investigating detectives] return[ed], and then once it's light, now it's probably 6:00 or 7:00 in the morning, and *I'm out there as well, we decide to go up the path.*"

2. During his direct examination of Amy, the following colloquy ensued:

"When you participated in this physical lineup at the jail, was Detective Harter there also, from the Sheriff's Department?"

"Yes."

*"And I was there?"*

"Yes."

3. During his direct examination of Detective Lackie, the following colloquy ensued:

"When was this slide taken or this photograph taken?"

"March 25, 1986."

"Now, on March 25, 1986, when the crime scene was being processed by the sheriff's department, *was I also at that location?*"

"You were."

4. & 5. During his direct examination of Dennis Harter, an investigator employed by the Riverside County Sheriff's Department, the following colloquy ensued:

"Prior to this physical lineup actually being conducted, did you read that admonition to Amy []?"

"Yes, I did."

"Who else was present during that period of time?"

*"You were there,* myself, Amy, District Attorney Investigator Bruce Rouse, and Sharon Davis, who is a counselor for Amy []."

" . . . . . . . . . . . . . . . . . .

"On May 12th, who actually was in the viewing room area with Amy []?"

"It was the five people that I named."

"Now, were there any other witnesses who were to participate at all in this lineup, or just Amy [], herself?"

"Just Amy []."

"Can you tell us what occurred *after all of us were inside the viewing room,* the door was closed behind us, the light was turned off, and as the five suspects then began to enter into the viewing area, itself, can you tell us what happened?"

6. After the prosecutor recalled Detective Lackie as a witness, the following colloquy ensued:

"I'm not sure if we've covered this or not, Detective Lackie, but first of all I'd like to ask you if on March 26, 1986, did you have occasion to attend the autopsy for Diane Harper?"

"Yes."

"And *was I also present at that autopsy?*"

"Yes, you were."

Defendant includes, within his nine instances of alleged prosecutorial misconduct, certain *penalty phase* remarks, set forth below for ease of reference.

7. During the prosecutor's direct examination of Dr. F. Rene Modglin, the following colloquy ensued:

"Were there sheriff's department personnel during the course of the autopsy [of victim Shelah]?"

"Yes."

" . . . . . . . . . . . . . . . . . .

*"As well as myself?"*

the references challenged here were the subject of an objection interposed at trial. Defendant contends, however, that his failure to object should not operate as a waiver of the claim (see *People* v. *Hardy* (1992) 2 Cal.4th 86, 171 [5 Cal.Rptr.2d 796, 825 P.2d 781] [failure to object to misconduct generally waives claim]; *People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610] [same]), because the harm could not have been cured by a prompt objection and admonition to the jury. (See *People* v. *Benson, supra,* 52 Cal.3d 754, 794; *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Kirkes* (1952) 39 Cal.2d 719 [249 P.2d 1].) Further, defendant contends that the asserted misconduct by the prosecutor was prejudicial and requires reversal of the judgment.

We previously have rejected arguments that were virtually identical to the claimed exception to the waiver rule asserted by defendant here. (See, e.g., *People* v. *Lucas* (1995) 12 Cal.4th 415, 473 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People* v. *Gionis* (1995) 9 Cal.4th 1196, 1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) We perceive no reason why a prompt objection and admonition could not have cured the asserted harm of the prosecutor's remarks and perhaps averted many of the references by the prosecutor. (See, e.g., *People* v. *Lucas, supra,* 12 Cal.4th at p. 473; *People* v. *Rowland, supra,* 4 Cal.4th 238, 274-275; *People* v. *Wharton* (1991) 53 Cal.3d 522, 566-567 [280 Cal.Rptr. 631, 809 P.2d 290].) Therefore, we conclude that defendant did not properly preserve this claim for appeal.[21]

Moreover, even if defendant had preserved his claim and we were to assume that the challenged remarks of the prosecutor constituted misconduct, we would conclude that in view of the overwhelming evidence against defendant and the nature of the prosecutor's comments, there is no possibility that the jury would have reached a verdict more favorable to defendant in

---

"Yes."

8. During the prosecutor's recross-examination of Detective Sanchez, the following colloquy ensued:

"Detective Sanchez, *was I personally present out at the crime scene* where Shelah McMahan's body was located on May 3rd, 1986?"

"You were."

9. During his closing argument in rebuttal, the prosecutor informed the jury: "You people have been living with me and this case for about three months now. *I've been living with this case for almost two years, actually over two years.* From the date of March 24th, *when I was called out to the Badlands, I had the unfortunate opportunity of seeing Diane Harper's body.* [¶] *I also had the unfortunate opportunity of seeing Shelah McMahan's body.* [¶] Obviously, words are insufficient by me to relate to you *the feelings I experienced.*"

[21]Because the record on appeal does not definitively establish a basis for " ' "why counsel acted or failed to act in the manner challenged," ' " defendant's contention that trial counsel's failure to object to the prosecutor's remarks amounted to ineffective assistance of counsel is more appropriately decided in a habeas corpus proceeding. (*People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266-267.)

the absence of these comments. (*People* v. *Wash* (1993) 6 Cal.4th 215, 261 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

F. *Jury Instruction on Destruction of Evidence .*

. At the prosecutor's request, and without objection from the defense, the trial court instructed the jury regarding destruction of evidence, pursuant to the pattern instruction set forth in CALJIC No. 2.06.[22] Defendant contends that in so instructing the jury, the trial court committed reversible error, because the record does not demonstrate that evidence was destroyed.

We conclude this claim lacks merit. Well settled standards apply: "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference." (*People* v. *Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203].)

To support an inference that the defendant attempted to suppress evidence, the record need not establish that the evidence actually was destroyed. (See, e.g., *People* v. *Rodrigues, supra,* 8 Cal.4th 1060, 1139-1140 [CALJIC No. 2.06 properly given where circumstantial evidence suggested that defendant threw a knife from a motor vehicle, although the knife subsequently was recovered]; *People* v. *Breaux* (1991) 1 Cal.4th 281, 304, fn. 7 [3 Cal.Rptr.2d 81, 821 P.2d 585] [CALJIC No. 2.06 properly given, based upon evidence of defendant's postoffense substitution of the license plates on the victim's car]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 797-798, 833 [281 Cal.Rptr. 90, 809 P.2d 865] [rejecting the defendant's contention that the giving of CALJIC No. 2.06 was improper absent a showing that he was aware that the items he destroyed constituted evidence, where the defendant admitted throwing his prison clothes and prison-issue tennis shoes into the ocean]; see also *People* v. *Echevarria* (1992) 11 Cal.App.4th 444, 451 [13 Cal.Rptr.2d

---

[22]The trial court instructed as follows: "If you find that a defendant attempted to suppress evidence against him in any manner, such as by destroying evidence or by concealing evidence, such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration." (CALJIC No. 2.06.)

840] [CALJIC No. 2.06 properly given based upon evidence that, after the murder, defendant shaved off his beard and mustache and cut his hair]; *People* v. *Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1290, 1296-1297 [3 Cal.Rptr.2d 808] [CALJIC No. 2.06 properly given based upon circumstantial evidence indicating that defendant threw murder weapon into a gutter, where pieces of a rifle were located in a nearby storm drain catch basin].)

In the present case, the record discloses evidence that, after Diane was murdered, defendant disposed of her purse, including her identification, at Lake Matthews, removed and replaced bumper stickers on his car, burned a pair of tennis shoes, and used plywood to shield his car from view. Furthermore, when defendant was arrested, he wore his hair parted in the middle, wavy and fluffy, similar to the style Amy had described, but at the in-person lineup, defendant wore his hair wet or oily, and combed straight back. The next day, defendant returned to his previously preferred "dry look."

The jury reasonably could infer from the foregoing evidence that defendant *attempted* to suppress evidence. Actual destruction of that evidence was not required. The trial court therefore properly instructed the jury pursuant to CALJIC No. 2.06. (*People* v. *Rodrigues, supra,* 8 Cal.4th 1060, 1140.)[23]

G. *Whether the Trial Court Erred in Failing Sua Sponte to Provide Clarifying Instructions Regarding the Sodomy-murder Special Circumstance*

At trial, the prosecution's theory of the case was that defendant's effort to entice the girls into his vehicle and drive them to a remote area was part of a premeditated plan to commit rape, and that the murder of Diane was committed in the course of perpetrating rape. As noted, the defense did not deny that defendant was the man who took the girls to the remote area and assaulted them, killing Diane; instead, defense counsel argued to the jury that the evidence suggested Diane had been killed in the course of defendant's having committed, or having attempted to commit, sodomy, and therefore supported no more than a verdict of second degree felony murder. (See fn. 2, *ante.*)

The trial court instructed the jury on the law of murder (CALJIC No. 8.10 (1983 rev.)), further explaining the elements of first and second degree murder as well as felony murder. With respect to the latter theory, the trial

---

[23]In view of our conclusion that the trial court properly instructed the jury regarding destruction of evidence, we reject defendant's related contention that, in instructing the jury pursuant to CALJIC No. 2.06, the trial court committed prejudicial error in violation of defendant's constitutional rights to a fair trial, a reliable determination of guilt and penalty, due process of law, and fundamental fairness.

court instructed the jury that under the law applicable at the time, a killing committed during the course of a rape or attempt to commit rape was first degree felony murder, and that a killing committed during the course of a sodomy, or attempt to commit sodomy, was second degree felony murder. Defendant did not object to any of these instructions.

■ Defendant now contends that the jury instructions were impermissibly ambiguous and that the trial court failed to fulfill its sua sponte duty to offer clarifying instructions informing the jury that a first degree murder *could not* be based upon the underlying felony of sodomy or attempted sodomy, even though first degree murder committed in the commission of such crimes *could* support a special circumstance finding. Defendant's failure to request such a clarifying instruction at trial, however, waives his claim on appeal. (See *People* v. *Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627], ["A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285] [same].)

Moreover, the jury instructions were not ambiguous. The jurors were instructed that *if* they found defendant guilty of murder in the first degree, *then* they were to determine whether either special circumstance was true. The jurors also were instructed to decide each special circumstance separately. These instructions correctly stated the law; if defendant wanted additional, clarifying instructions, he should have requested them. No ambiguity appearing, the trial court complied with its duty to "fully instruct the jury on the law applicable" (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311], overruled on other grounds, *People* v. *Barton* (1995) 12 Cal.4th 186, 200 [47 Cal.Rptr.2d 569, 906 P.2d 531]) and had no duty to further instruct the jury.[24]

Relying upon *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809], defendant further contends that the trial court had a duty to instruct specially on partial verdicts and to provide separate verdict forms as to possible levels of murder, in order to ensure that the jury considered the rape and sodomy special circumstances separately. Defendant's reliance upon *Stone* is misplaced, however, as that case involved a jury that was

---

[24]In view of our conclusion that the trial court fully and accurately instructed the jury, we reject as without merit defendant's contention that the giving of those instructions denied him his Sixth Amendment right to a fair trial.

We also reject as without merit defendant's contention that the trial court failed to provide the jurors with separate forms for each special circumstance allegation. Such forms, in fact, were provided and used.

unable to reach a verdict. (31 Cal.3d at pp. 507-509.) In the present case, there was no indication of a deadlocked jury.

## H. *Ineffective Assistance of Counsel at the Guilt Phase*

Defendant contends that he was denied effective assistance of counsel based upon certain failings of his attorney prior to and during the guilt phase of the trial. Specifically, defendant contends that trial counsel performed deficiently in failing to (1) challenge an allegedly coercive and suggestive lineup, conducted in the absence of an attorney (at a time when defendant was represented by the Office of the Riverside Public Defender), (2) seek the exclusion of physical evidence derived from statements that purportedly were obtained in violation of defendant's rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436, (3) prepare and articulate a defense, (4) request a hearing pursuant to Evidence Code section 402 regarding the prosecution's electrophoresis evidence, (5) challenge the admissibility of the testimony of Dr. Rath, a psychologist who testified for the prosecution, and (6) present an adequate closing argument.[25]

Defendant argues that trial counsel's performance fell below the standard expected of reasonably competent counsel, thereby depriving defendant of his constitutional rights to a fair trial, effective assistance of counsel, a reliable verdict, due process of law, and fundamental fairness. After setting forth the well settled rules that guide our inquiry, we shall address each of defendant's contentions in turn.

We recently reiterated the applicable principles: To prevail on a claim of ineffective assistance of counsel, defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 690 [104 S.Ct. at p. 2066].) To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no

[25]As described earlier in this opinion, we have considered and rejected defendant's claim of prejudicial error with regard to certain other errors purportedly committed by counsel, notably counsel's failure to (1) more thoroughly conduct the voir dire examination of potential jurors, (2) object to the prosecutor's having noted his own presence during key points in the investigation, (3) more vigorously challenge the testimony of Amy, and (4) object to the prosecutor's closing argument. Having found no constitutionally deficient performance, we perceive no reason to revisit those issues.

satisfactory explanation . . . .' (*People* v. *Pope* [(1979)] 23 Cal.3d [412,] 426 [152 Cal.Rptr. 732, 590 P.2d 859], fn. omitted.) Finally, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland* v. *Washington*, *supra*, 466 U.S. at p. 694 [104 S.Ct. at p. 2068]; *People* v. *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)" (*People* v. *Bolin* (1998) 18 Cal.4th 297, 333 [75 Cal.Rptr.2d 412, 956 P.2d 374]; see also *Strickland* v. *Washington*, *supra*, 466 U.S. 668, 689 [104 S.Ct. 2052, 2065] ["A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."]; *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266 [" ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' "]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144] [on appeal, a conviction will be reversed on the ground of ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission"].)

## 1. *The Lineup*

Shortly after defendant's arrest, the Riverside County Sheriff's Department conducted a lineup that consisted of defendant and four other participants. At the time of the arrest, defendant was represented by the Office of the Riverside Public Defender. Prior to the lineup, a deputy public defender appeared at the station. Upon seeing the composition of the lineup, the public defender objected on the basis that the lineup was unfair, and departed. Defendant was left without counsel and initially refused to participate in the lineup. According to defendant (who testified outside the jury's presence, in the context of a *Marsden* hearing discussed *ante*, at pages 600-604), a detective informed him: "If you refuse to take this lineup, I will drag you in by your fucking neck." Defendant informed the court that he feared for his own safety and therefore participated in the lineup, in which he was identified by the surviving victim.

On appeal, defendant contends that his trial counsel performed deficiently in failing to challenge the evidence obtained as a result of the lineup. Defendant maintains that such evidence could have been suppressed on the ground that defendant was coerced into participating in the lineup, that his counsel was not present at the lineup, and that the lineup was suggestive.

We observe initially that this ineffective assistance claim cannot properly be raised on appeal, because the record before us does not reveal the basis for trial counsel's decision not to object to the lineup, and that decision is not of the type for which there could be no satisfactory explanation. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People* v. *Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.) Counsel reasonably may have concluded that in view of the physical evidence that linked defendant to the crimes, and the extended period of time during which Amy had an opportunity to observe defendant on the day the crimes were committed, there was little to be gained by challenging the validity of the lineup. Such tactics would be consistent with counsel's overall trial strategy not to challenge defendant's presence at the crime scene, but instead to claim that the killing of Diane did not constitute first degree murder. Thus, regardless whether trial counsel successfully might have objected to the lineup or its fruits, counsel could have had a reasonable tactical basis for not challenging the admission of this evidence at trial.

Furthermore, on the merits, defendant has failed to demonstrate that an objection to the evidence obtained as a result of the lineup would have been successful. Although it is true that a lineup represents a "critical stage" to which a defendant's Sixth Amendment right to counsel attaches (*United States* v. *Wade* (1967) 388 U.S. 218 [87 S.Ct. 1926, 18 L.Ed.2d 1149]; *People* v. *Bustamante* (1981) 30 Cal.3d 88 [177 Cal.Rptr. 576, 634 P.2d 927]; *People* v. *Fowler* (1969) 1 Cal.3d 335 [82 Cal.Rptr. 363, 461 P.2d 643]), the public defender's *refusal* to attend the lineup cannot be equated with a *denial* of defendant's right to counsel, and a defendant generally has no right to refrain from participating in a lineup. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1221-1222 [14 Cal.Rptr.2d 702, 842 P.2d 1].) Nor does the record on appeal suggest that the lineup, as conducted, was improperly suggestive or unfair.[26]

In sum, the record on appeal does not support defendant's claim that his trial counsel performed deficiently in failing to object to the evidence obtained as a result of the lineup.

### 2. *Physical Evidence Derived From Defendant's Statements*

On May 4 and 5, 1986, Ronald Wade, a homicide investigator for the Riverside County Sheriff's Department, observed a vehicle in defendant's

---

[26]The record includes a photograph of the lineup that supports the following observations of the trial court regarding the fairness of the procedure: "There is a picture of that lineup there and the picture shows they tried to pick people of about generally the same coloring, same facial hair, same basic build and so forth and from looking at the picture and hearing Amy['s] testimony, it really is convincing to me that an effort was made to conduct a rather fair lineup and it was a fair lineup."

driveway that was similar to the suspect vehicle description given in the investigation of Diane's homicide. On May 6, Wade and another investigator visited defendant at the mobilehome on the property. Wade asked defendant to describe the nature of his employment; defendant responded that he was a construction worker who "drove big rigs to landscape development property." In response to Wade's inquiry regarding where defendant had worked in March of 1986, defendant replied that he worked in the Riverside/La Sierra area around McKinley and Magnolia. To confirm the location of his jobsite, defendant offered to retrieve his appointment book, which he used to keep track of the money owed to him. Defendant opened the book for Wade, revealing the word "MAG" written on March 24, which defendant indicated meant that he had worked at McKinley and Magnolia on that day. Wade departed from defendant's residence without arresting defendant or seizing the appointment book.

 Defendant contends that the investigators improperly failed to advise defendant of his rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436, prior to questioning him. As a result, according to defendant, he "unknowingly provided the officers with evidence which later was used against him, including his statements and tangible evidence," such as the appointment book. Defendant alleges that such evidence was the "fruit of the poisonous tree," and could have formed the basis for a meritorious challenge to the legality of defendant's arrest and the admissibility of all statements and evidence obtained as a result of the interrogation. (See *Wong Sun* v. *United States* (1963) 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441]; *People* v. *DeVaughn* (1977) 18 Cal.3d 889 [135 Cal.Rptr. 786, 558 P.2d 872].) He further contends that trial counsel performed deficiently in failing to challenge the admissibility of the physical evidence derived from the statements made by defendant to the investigators.

Defendant's contentions are unavailing, because the record on appeal does not disclose the basis for trial counsel's failure to object to this evidence, and the matter is not one in which there could be no satisfactory explanation for counsel's conduct. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People.* v. *Wilson, supra,* 3 Cal.4th 926, 936; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.) The evidence adduced at trial suggests that defendant's statements to the investigators were made voluntarily in a noncustodial setting, and indicates that all of the physical evidence in question, including defendant's appointment book, subsequently was seized pursuant to a valid search warrant. On the basis of the facts disclosed by the record, trial counsel reasonably could have concluded that an objection on *Miranda* grounds would lack merit (because the initial questioning of defendant occurred in a noncustodial setting) and that the investigating officers'

failure to give a *Miranda* warning during this conversation thus provided no basis for excluding the evidence seized pursuant to the search warrant. Accordingly, there is no merit in defendant's claim that trial counsel performed deficiently in this respect.[27]

### 3. *Failure to Prepare and Articulate a Defense*

Defendant raises a general challenge to his counsel's performance at trial, alleging that counsel's representation at the guilt phase was substandard due to counsel's lack of investigation, preparation, and inability to articulate a defense. In support of his challenge, defendant cites counsel's single visit to defendant in seven and one-half months, and counsel's failure to investigate or present any evidence of defendant's mental history (including defendant's classification as a mentally disordered sex offender) or competence to stand trial.

Defendant's contentions are unpersuasive, because the record before us does not disclose that trial counsel lacked a tactical basis for representing defendant in the manner now challenged, and counsel's performance was not of the sort for which there could be no satisfactory explanation. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People* v. *Wilson, supra,* 3 Cal.4th 926, 936; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.) Defendant's position also is flawed because, in large measure, his argument merely recasts certain contentions that the trial court properly rejected in the context of the *Marsden* hearings held prior to and during defendant's trial. (See pt. II.A., *ante,* at pp. 600-604.) To the extent such arguments do not reiterate those that we already have rejected, we find them to be without merit.

As noted previously, trial counsel was confronted with overwhelming evidence that defendant killed Diane in the course of a sexual assault, and the manner of killing (repeated powerful blows to the back of the head with a rock), combined with defendant's statement to Amy that "your friend was an asshole, she called me a few names, and I think she's dead," strongly suggested that he acted with the intent to kill. In view of these circumstances, trial counsel could have had a reasonable tactical basis for deciding

---

[27]In addition to claiming that trial counsel was ineffective in failing to raise a *Miranda* objection, defendant claims on appeal that the admission of the statements and the physical evidence in question violated his constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. Defendant did not object to the introduction of this evidence on such grounds at trial, and thus has not preserved the issue for appeal. In any event, as we have explained, on the basis of the evidence introduced at trial, we conclude that the investigators were not required to advise defendant pursuant to *Miranda* during their conversation with him at his residence.

to forego the presentation of a mental state defense in favor of a defense challenging the prosecution's forensic evidence. Counsel's strategy conceivably could have persuaded the jury to acquit defendant of the charge that he raped Diane and to convict him only of second degree murder.

Defendant's defense at the guilt and penalty phases of trial was not presented by the same attorney. Thus, his contention that his *guilt phase* attorney failed to investigate evidence pertaining to defendant's mental history merely begs the question, as such evidence *was* investigated by defendant's *penalty phase* attorney, and the record does not suggest that the two attorneys failed to communicate with one another in their representation of defendant. Having made the tactical decision not to present a mental state defense at the guilt phase, and instead to challenge the evidence regarding certain sexual offenses defendant was alleged to have committed against Diane and Amy, defendant's guilt phase attorney did not perform deficiently by failing to *personally* investigate mental health issues further or visit defendant more frequently. (See, e.g., *People* v. *Silva, supra,* 45 Cal.3d 604, 622 [rejecting defendant's complaint that his attorney had visited him only once, observing that "the number of times one sees his attorney, and the way in which one relates [to] his attorney, does not sufficiently establish incompetence"].) Further, because of the incriminatory nature of defendant's history of committing sex crimes, it seems clear that such evidence, had it been presented at the guilt phase, would have been unhelpful—if not highly prejudicial—to defendant's claim of innocence.

Nor did counsel render inadequate assistance in failing to raise the issue of defendant's competency to stand trial; the record is devoid of evidence suggesting any basis for such a challenge.

In sum, the record on appeal does not support defendant's claim that his counsel performed deficiently in preparing or presenting a defense.

### 4. *Failure to Request a Hearing Pursuant to Evidence Code Section 402 Regarding the Prosecution's Electrophoresis Evidence*

■ James Hall, the prosecution's criminalist, testified that a stain found on Amy's slip tested positive for both blood and seminal fluid, although neither substance could be typed using electrophoresis. Thus, the testimony did not establish whether it was defendant who deposited the stain. Notwithstanding the inconclusive nature of Hall's testimony, defendant contends that his trial counsel performed deficiently in failing to request a hearing pursuant to Evidence Code section 402, or to seek a *Kelly-Frye* hearing, to challenge the electrophoresis evidence. (See *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014, 54 App.D.C. 46, 34 A.L.R. 145.)

Defendant's contention is unavailing, because the record on appeal fails to disclose that trial counsel lacked a tactical basis for declining to challenge the electrophoresis evidence, and counsel's decision was not one for which there could be no satisfactory explanation. (See *People v. Mendoza Tello, supra*, 15 Cal.4th 264, 266; *People v. Wilson, supra*, 3 Cal.4th 926, 936; *People v. Fosselman, supra*, 33 Cal.3d 572, 581.) Although the criminalist testified that the contributor of the stain might have been a nonsecretor (as was defendant), the criminalist also testified that the inability to type the stain could have been due to the insufficient strength of the stain, or due to degradation attributable to the passage of time. Thus, as noted, the evidence did not identify defendant as the contributor. Trial counsel therefore reasonably may have concluded that the evidence was not particularly prejudicial, and on that basis reasonably could have made a tactical decision not to challenge the admissibility of this evidence, or the reliability of the electrophoresis testing. During cross-examination, trial counsel exploited the weakness of this evidence, asking questions that emphasized its inconclusive nature.

Defendant's assertion of ineffective assistance of counsel based upon trial counsel's failure to request a *Kelly-Frye* hearing similarly is unpersuasive. Again, the record before us fails to disclose that trial counsel lacked a tactical basis for declining to request such a hearing, nor was counsel's decision to refrain from doing so one for which there could be no satisfactory explanation. (See *People v. Mendoza Tello, supra*, 15 Cal.4th 264, 266; *People v. Wilson, supra*, 3 Cal.4th 926, 936; *People v. Fosselman, supra*, 33 Cal.3d 572, 581.) At the time of defendant's trial, electrophoretic typing of dried bloodstains had gained general acceptance in the scientific community. (*People v. Reilly* (1987) 196 Cal.App.3d 1127, 1148-1153 [242 Cal.Rptr. 496].) Trial counsel was under no obligation to interpose a meritless challenge to a generally accepted scientific technique. (See *In re Lower* (1979) 100 Cal.App.3d 144, 149, fn. 3 [161 Cal.Rptr. 24] ["[T]here is no obligation on the part of any attorney to embark on a program of fruitless, time-consuming, nonproductive motions which . . . may make a dandy record but be of little or no value to his client."].) We therefore reject defendant's contention that trial counsel performed deficiently regarding this issue, and find no basis for his related contention that counsel's performance deprived defendant of his constitutional rights.

### 5. *Failure to Challenge the Qualifications of Dr. Rath as an Expert*

The prosecution called Dr. Craig Rath, a licensed clinical psychologist at Patton State Hospital, to testify as an expert witness regarding two principal matters: (1) memory repression by someone who has experienced a traumatic event, and (2) an emotional "about-face" and showing of remorse on

the part of someone who has just committed a sexual assault. Rath's testimony apparently was intended to assist the jury in understanding certain aspects of Amy's testimony. On cross-examination, Rath acknowledged that he was unfamiliar with defendant or the surviving victim, not having interviewed either individual.

On appeal, defendant contends that trial counsel performed deficiently in failing to challenge Rath's qualifications or competence to testify as an expert regarding the matters about which he testified, particularly his testimony concerning the common conduct of "binge rapists." Defendant's claim cannot be sustained on appeal. The record on appeal fails to disclose that trial counsel lacked a tactical basis for declining to challenge Dr. Rath's qualifications or competence to testify as an expert, and counsel's decision to refrain from doing so was not one for which there could be no satisfactory explanation. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People* v. *Wilson, supra,* 3 Cal.4th 926, 936; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581; see also *People* v. *Freeman* (1994) 8 Cal.4th 450, 490-491 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888] ["Because the decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence."].) At the time of defendant's trial, Rath had performed more than 2,000 court-directed psychological evaluations and had testified "a couple of hundred times in nine counties in California and four other states," and there is no indication in the record that he did not have expertise with regard to the matters to which he testified. Thus, on the record before us, we perceive no deficiency on counsel's part in failing to challenge Dr. Rath's qualifications.

### 6. *Failure to Present an Effective Closing Argument*

Defense counsel's closing argument urged the jury to reject the prosecution's theories that the murder of Diane either was premeditated or occurred during the commission of a rape. Defense counsel instead acknowledged that defendant was present at the crime scene with the victims, and that circumstantial and physical evidence linked defendant to the crimes. He further acknowledged the reasonableness of finding that defendant had committed a sodomy or attempted sodomy, but not rape or attempted rape. In so doing, counsel urged the jury to find defendant guilty of *second degree* felony murder under the law as it applied at defendant's trial—thereby precluding penalty phase proceedings. (See p. 580, fn. 2, *ante.*)

On appeal, defendant contends that trial counsel's strategy improperly led the jury to return a finding of "true" with respect to the *special circumstance* of sodomy, ensuring that the case would proceed to a penalty

phase, and thereby depriving defendant of the effective assistance of counsel. We have rejected similar claims in other cases involving concessions made by defense counsel in closing argument, where the incriminating evidence was strong and counsel offered some other choice in the defendant's favor. We do so here, as well. (See, e.g., *People* v. *Bolin, supra,* 18 Cal.4th. 297, 334-335 [rejecting a claim of ineffective assistance of counsel related to counsel's concession of some measure of culpability, as a valid tactical choice given the overwhelming evidence of defendant's guilt]; *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1186-1187 [9 Cal.Rptr.2d 834, 832 P.2d 146] [rejecting a claim of ineffective assistance of counsel related to counsel's concession in closing argument that defendant had been present at the scene of the crime, repudiating the defendant's alibi testimony]; see also *People* v. *Wade* (1988) 44 Cal.3d 975, 988 [244 Cal.Rptr. 905, 750 P.2d 794] ["In light of the overwhelming evidence of his client's guilt, trial counsel had little choice but to candidly acknowledge guilt, concede the heinous nature of the offense, and concentrate instead on convincing the jury of the legitimacy of defendant's mental defenses."]; *People* v. *Ratliff* (1986) 41 Cal.3d 675, 697 [224 Cal.Rptr. 705, 715 P.2d 665] ["Counsel's tactical decision to argue a particular personal view of the evidence, indicating that his client may have committed only a lesser offense, is not akin to pleading guilty to that offense."]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 293 [168 Cal.Rptr. 603, 618 P.2d 149] [" '[G]ood trial tactics demanded complete candor' with the jury."].)

Although it is true that counsel's closing argument was not lengthy—13 pages in the reporter's transcript—the record on appeal discloses nothing to suggest that counsel's decision to thus limit his argument was unreasonable. To the contrary, the overwhelming nature of the evidence against defendant left counsel with little opportunity to mount a persuasive summation. The surviving victim had testified in graphic detail regarding defendant's involvement in the charged offenses. Defendant's fingerprint was found on a beer bottle recovered from the remote crime scene. Other physical and circumstantial evidence linked defendant to the crimes. In view of the evidence presented against defendant, trial counsel reasonably could have concluded that challenging the evidence more vigorously in his argument risked alienating the jury and perhaps lessening his odds of success at the penalty phase. (See *People* v. *Bolin, supra,* 18 Cal.4th 297, 335 ["Since counsel could also reasonably anticipate having to conduct a penalty phase, it also allowed him to preserve his credibility in arguing mitigation."]; *People* v. *Cox* (1991) 53 Cal.3d 618, 661-662 [280 Cal.Rptr. 692, 809 P.2d 351] [rejecting a claim of ineffective assistance of counsel where, for tactical reasons, defendant's attorney declined at the guilt phase to present any evidence or argument in response to the evidence presented by the prosecutor].) Counsel's decision to acknowledge defendant's culpability—but to a

lesser extent than that urged by the prosecution, in an effort to spare his client from a penalty phase—was not a tactical choice that could not be satisfactorily explained. No deficiency appears.[28]

### 7. Conclusion

The record on appeal fails to shed light on the basis for counsel's decisions in his representation of defendant at trial. For that reason, and because none of counsel's purported failings cannot be explained as part of a reasonable trial strategy, we reject defendant's contention that he was denied the effective assistance of counsel. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People* v. *Wilson, supra,* 3 Cal.4th 926, 936; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.) Moreover, based upon the record before us, none of the purported failings by counsel fall below an objective standard of reasonableness (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216, 217 [233 Cal.Rptr. 404, 729 P.2d 839]), and for that additional reason we reject defendant's claim that he was denied the effective assistance of counsel. Apart from these flaws in his argument on appeal, defendant fails to establish prejudice in light of the overwhelming evidence introduced against him. He fails to establish that his trial counsel's performance deprived him of any meritorious defense, or to demonstrate a reasonable probability that the result would have been more favorable to him in the absence of any alleged ineffectiveness. (See *Strickland* v. *Washington, supra,* 466 U.S. at pp. 687-689 [104 S.Ct. at pp. 2064-2065]; *People* v. *Bolin, supra,* 18 Cal.4th 297, 333; *People* v. *McPeters, supra,* 2 Cal.4th 1148, 1187.)

### III. Penalty Phase Issues

### A. Denial of the Right to Counsel at the Penalty Phase

■ Defendant contends he was denied his constitutional rights to counsel, a fair trial, a reliable verdict, and due process of law when, without "notice, waiver, consent or order of court," his second counsel, Steven Harmon, represented him at the penalty phase of the trial. Defendant also asserts that Harmon could not adequately assist him at the penalty phase because Harmon was not present at either the jury selection or the guilt phase of trial and lead attorney Barnett was not present to assist Harmon at the penalty phase. Defendant implies that Attorney Harmon was forced upon him at the penalty phase, or was otherwise improperly substituted for lead defense counsel. This argument is without merit.

---

[28]The trial court viewed defense counsel's performance in a similar fashion, observing (at the post-penalty-phase hearing on defendant's application to modify the verdict, pursuant to section 190.4, subdivision (e)): "I recall the arguments made by Mr. Barnett. I think he took the only reasonable tactic, relying—the case was so overwhelming as to evidence, and there is a gap in the law relating to felony murder as it applies to sodomy. And I think Mr. Barnett made a rather experienced and sophisticated decision which not everybody would see that this is perhaps his only chance, and took it, arguing that the sodomy murder made it second degree murder and we would not even get to the special circumstance."

At a pretrial hearing conducted on February 19, 1987 (nearly one year prior to the commencement of the guilt phase of the trial), lead counsel for the defense, William Barnett, moved for appointment of *second* counsel, pursuant to section 987.2. Barnett described second counsel Harmon as "eminently qualified and very experienced." Barnett thereafter informed defendant: "Mr. Hart, I just introduced you to Steve Harmon, explained to you that we were going to co-counsel and come up and talk to you; do you agree Mr. Harmon can co-counsel with me in your case?" Defendant replied: "Yes." The trial court thereafter appointed Harmon as cocounsel.

The record is devoid of any suggestion that second counsel Harmon was *substituted* for lead counsel Barnett, forced upon defendant, or revealed to defendant in an untimely fashion. Defendant's consent to Attorney Harmon's assistance in the representation of defendant was clear and unequivocal, as was the trial court's discretionary decision (*Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]) to permit Harmon to serve as *co*counsel. In view of the prosecution's intention to present at the penalty phase defendant's numerous prior convictions as well as the evidence linking him to the murder of Shelah McMahan, the appointment of Harmon was well within the trial court's discretion (*Keenan* v. *Superior Court, supra,* 31 Cal.3d 424, 430-432) and facilitated the preparation and presentation of a full and complete defense. (*People* v. *Frierson* (1979) 25 Cal.3d 142, 163 [158 Cal.Rptr. 281, 599 P.2d 587].) The circumstance that defendant's two attorneys shared the representation of defendant by having lead counsel Barnett handle the guilt phase of the trial, and cocounsel Harmon the penalty phase, did not reflect a substitution of the latter attorney for the former.

Defendant raises a related contention that the "substitution of counsel" led to "a disturbing pattern of ineffective assistance of counsel." In support of this contention, defendant argues that Harmon was unfamiliar with the record, surprised by Cindy Widney's testimony, and cursory in his examination of Criminalist Faye Springer. In order to establish his claim, however, defendant must point to a deficiency so egregious that his attorney's conduct fell outside the "wide range of reasonable professional assistance," and that he was prejudiced by the deficiency. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 689 [104 S.Ct. 2052, 2065]; *In re Jones* (1996) 13 Cal.4th 552, 561 [54 Cal.Rptr.2d 52, 917 P.2d 1175].) He fails to do so. As noted, there was no "substitution." Nor does the record support a claim of ineffective assistance. To the contrary, defense counsel at the penalty phase vigorously cross-examined key prosecution witnesses, sought to cast doubt on the case against defendant involving Shelah, and presented a thorough case in mitigation. During the penalty phase, defendant expressed his high regard for

defense counsel, informing the court: "As for phase two, I am totally pleased with both my counsel."

In view of the foregoing, we reject defendant's contention that the appointment of Attorney Harmon to the defense team denied defendant his constitutional right to counsel.[29]

### B. Ineffective Assistance of Counsel at the Penalty Phase

Defendant contends that his trial counsel committed three critical errors at the penalty phase, denying defendant his right to the effective assistance of counsel. Specifically, defendant asserts that counsel inappropriately failed to (1) challenge certain scientific evidence pertaining to the murder of Shelah, (2) fully impeach jailhouse informant Randy Gresham, and (3) investigate and present a mental health defense.

■■ In reviewing defendant's claims, we apply the same standards we discussed in evaluating defendant's assertion that counsel performed deficiently at the guilt phase: defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." (*People* v. *Bolin, supra,* 18 Cal.4th 297, 333; *People* v. *Ledesma, supra,* 43 Cal.3d 171, 216, 217.) Defendant can prevail on appeal "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.) The record also must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [104 S.Ct. 2052, 2068]; *People* v. *Bolin, supra,* 18 Cal.4th 297, 333.)

### 1. Failure to Challenge Scientific Evidence

At the penalty phase, the prosecution introduced evidence of electrophoretic testing of dried blood that had been found on handcuffs recovered from a shed located behind defendant's residence. (Electrophoretic testing "allows typing of individual blood proteins and enzymes found in a blood sample by a method that separates electrically charged molecules" (*People* v. *Morris, supra,* 53 Cal.3d 152, 206.).) The blood was similar in type to Shelah's. The prosecution also introduced evidence related to electrophoretic

---

[29]We also reject defendant's contention that reversal was required without a showing of prejudice under *United States* v. *Cronic* (1984) 466 U.S. 648 [104 S.Ct. 2039, 80 L.Ed.2d 657], which states that a defendant need not show prejudice "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (*Id.* at p. 659, fn. 25 [104 S.Ct. at p. 2047].) One or the other of defendant's attorneys was present at all critical stages of the proceedings. We observe that, at the hearing on defendant's application to modify the verdict (§ 190.4, subdivision (e)), defendant's guilt phase attorney affirmed that counsel at each phase of the trial "worked very closely together during the case."

testing of a semen stain found on Shelah's sweatpants; on cross-examination, the prosecution's expert acknowledged that no conclusion could be drawn as to typing the semen donor, or as to the age of the stain.

Defendant contends that, at the time of his trial, there was considerable debate regarding the admissibility of electrophoretic evidence, citing *People* v. *Brown* (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516], reversed on other grounds, *California* v. *Brown* (1987) 479 U.S. 538 [107 S.Ct. 837, 93 L.Ed.2d 934], a decision in which we held that testimony of the same forensic expert, Faye Springer, regarding electrophoretic evidence should have been excluded from the trial. Defendant contends that trial counsel's failure to object to the admission of the electrophoretic evidence, and counsel's failure to request a foundational hearing pursuant to Evidence Code section 402, constituted ineffective assistance of counsel.

Defendant's position is unpersuasive, because the record on appeal fails to reflect that trial counsel lacked a tactical basis for declining to challenge the electrophoresis evidence or request a foundational hearing, and counsel's decisions regarding those matters were not ones for which there could be no satisfactory explanation. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People* v. *Wilson, supra,* 3 Cal.4th 926, 936; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.)

Defendant's reliance upon *People* v. *Brown, supra,* 40 Cal.3d 512, is misplaced. In *Brown,* we held that the trial court erred in overruling an objection *on the ground of improper foundation* to admitting forensic analysis of blood and semen stains. Contrary to defendant's position, we did not reject the reliability of electrophoretic analysis generally; rather, we did so in that case based upon the inadequate trial court record. Moreover, in *People* v. *Morris, supra,* 53 Cal.3d 152, we held that admission of electrophoresis testing *was* generally accepted in the scientific community in 1987—a date prior to its introduction at the penalty phase in defendant's trial. (*Id.* at pp. 206-208; see also *People* v. *Reilly, supra,* 196 Cal.App.3d 1127.) Defense counsel was not required to mount a meritless challenge to the acceptance of such evidence.

We therefore perceive no deficiency in counsel's performance regarding the prosecution's presentation of electrophoretic evidence.

### 2. *Failure to Seek Exclusion of the Jailhouse Informant's Testimony*

As noted, Randy Gresham, a jailhouse informant, testified for the prosecution. When defendant was arrested, Gresham was a convicted felon

awaiting trial in Riverside County. Shortly after defendant's arrest, Gresham was housed in the same county jail cell as defendant. During the time the two were cellmates, defendant made a number of damaging admissions to Gresham regarding the murder of Shelah. Gresham subsequently conveyed this information to law enforcement authorities, who offered Gresham a five-year reduction in his prison sentence if he testified against defendant. Gresham did so.

Defendant contends that Gresham was a government agent employed to elicit incriminating information from defendant. (See *Maine* v. *Moulton* (1985) 474 U.S. 159, 173 [106 S.Ct. 477, 485-486, 88 L.Ed.2d 481].) He further contends that the manner in which the prosecution procured Gresham's testimony violated defendant's constitutional rights to counsel, a fair trial, due process of law, fundamental fairness, and a fair and reliable penalty determination. (See *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; *Brady* v. *Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215].) In view of Gresham's status, defendant contends that his trial counsel performed deficiently in failing to challenge the admission of Gresham's testimony under *Massiah* and *Brady*.

We reject defendant's contention that his trial counsel performed deficiently in not seeking to exclude Gresham's testimony, because the record before us does not reveal that counsel lacked a tactical basis for declining to contest the admission of this testimony, and counsel's decision was not one for which there could be no satisfactory explanation. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People* v. *Wilson, supra,* 3 Cal.4th 926, 936; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.) We also observe that counsel's cross-examination of Gresham was zealous and thorough. Counsel sought to undermine Gresham's credibility by focusing upon Gresham's opportunism in testifying against defendant.

Defendant's related contention that Gresham acted as a government agent similarly is unsupported by the record on appeal. Gresham testified that defendant made his admissions *before* Gresham spoke with law enforcement officers regarding the possibility of trading testimony against defendant for a reduction in Gresham's prison sentence. After disclosing his information to police investigators, Gresham immediately was moved into a protective-custody cell, and defendant no longer spoke to him regarding the case. On these facts, a reasonably competent defense attorney could have concluded that there existed no obligation to challenge Gresham's testimony on the ground that defendant's admissions had been improperly obtained.

Based upon the record before us, we conclude that defendant has failed to establish that counsel's performance in addressing the damaging nature of Gresham's testimony was constitutionally deficient.

### 3. *Failure to Present a Mental Health Defense*

As noted, defendant committed several sexual assaults against women prior to his arrest for the sexual assault and murder of Diane Harper. His involvement in these previous crimes led to his commitment as a mentally disordered sex offender at Patton State Hospital. At the penalty phase of defendant's trial, defense counsel did not present evidence regarding the basis for defendant's commitment to the state hospital, or otherwise attempt to offer evidence to explain why defendant behaved violently toward women.

On appeal, defendant contends that counsel performed deficiently in failing to offer evidence that would explain the basis for defendant's violent conduct. According to defendant, counsel's failure to use qualified mental health experts to place "in context" defendant's childhood head injury and adult commitment to a state hospital led to the presentation of a constitutionally inadequate defense.

We are unpersuaded by defendant's argument, because the record before us does not reveal that counsel lacked a tactical basis for refraining from presenting evidence that would seek to explain defendant's violence toward women, and counsel's decision was not one for which there could be no satisfactory explanation. (See *People* v. *Mendoza Tello, supra,* 15 Cal.4th 264, 266; *People* v. *Wilson, supra,* 3 Cal.4th 926, 936; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.) Because the record on appeal contains no details of the mental health evidence that may have been available to trial counsel, and similarly contains no indication of the potentially damaging aspects of such evidence that might have been rendered admissible had defendant chosen to proffer his mental health background as a mitigating factor, we cannot conclude that there was no conceivable, reasonable tactical basis for trial counsel's actions. (See, e.g., *People* v. *Mickle* (1991) 54 Cal.3d 140, 189-190 [284 Cal.Rptr. 511, 814 P.2d 290].) Accordingly, defendant's claim that trial counsel was deficient in failing to present evidence of his mental health background cannot succeed on appeal.

We further observe that, although trial counsel did not present the mental health defense that defendant now contends was necessary, counsel did present considerable evidence that sought to portray defendant as a victim of numerous unfortunate circumstances. For example, the defense presented evidence of defendant's childhood head injury, his father's alcoholism and detachment from the family, and defendant's first wife's extramarital affair and his ensuing use of drugs. Although such matters did not comprise a "mental health" defense based upon the testimony of various mental health

experts, they did provide the jury with the opportunity to consider certain factors in mitigation—without exposing the jury to potentially damaging rebuttal evidence regarding defendant's mental health. In view of defendant's lengthy history of behaving violently toward women, and the interest of the defense in portraying defendant as favorably as possible, we cannot say on this record that there could not be a reasonable tactical basis for trial counsel's decision to rely solely upon mitigating evidence that showed defendant to be the victim of numerous unfortunate circumstances, in an effort to generate sympathy, and perhaps leniency, from the jury at the penalty phase. On the record before us, no constitutionally deficient representation appears.

### C. *The Defense Motion to Strike the Notice of Aggravation*

Prior to the commencement of trial, the prosecution filed a "Notice of Intention to Produce Evidence in Aggravation Pursuant to Section 190.3 of the Penal Code." The notice informed defendant of the prosecution's intention to present evidence at the penalty phase regarding the circumstances of the crimes committed against (1) Diane and Amy, (2) Shelah, (3) Debra B., (4) Valerie T., (5) Priscilla N., (6) Marilyn S., and (7) Deborah T. (The notice also named an eighth victim of sexual assault, but evidence pertaining to that incident ultimately was not presented at the penalty phase.) A defense motion challenging the adequacy of the notice was denied by the trial court.

On appeal, defendant renews his challenge to the adequacy of the notice, contending that it failed to satisfy the requirements of section 190.3. In pertinent part, that statute provides: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." Defendant contends that "evidence" means "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (See Evid. Code, § 140.) He argues that because the notice failed to identify the specific evidence that the prosecution planned to introduce—for example, the testimony of a particular witness—the notice was deficient, requiring reversal of the penalty phase judgment.

We repeatedly have rejected arguments similar to that made by defendant here. (See, e.g., *People v. Pride, supra,* 3 Cal.4th 195, 259; *People v. Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People v. Miranda* (1987) 44 Cal.3d 57, 96-97 [241 Cal.Rptr. 594, 744 P.2d 1127].)

The purpose of the notice required by section 190.3 is to advise the accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty phase. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 96.) "A capital defendant is entitled to notice of other violent crimes or prior felony convictions offered in the prosecution's penalty case-in-chief before the cause is called to trial or as soon thereafter as the prosecution learns the evidence exists. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 879 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 987 [251 Cal.Rptr. 278, 760 P.2d 475].) However, the prosecutor is not prevented from introducing all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein. (See, e.g., *People* v. *Howard* (1988) 44 Cal.3d 375, 424-425 [243 Cal.Rptr. 842, 749 P.2d 279].) The notice is sufficient if it gives defendant 'a reasonable opportunity' to prepare a defense to the allegations. (*Howard, supra,* at p. 425.)" (*People* v. *Pride, supra,* 3 Cal.4th at p. 258.)

We previously have held: "Notice that evidence will be presented regarding a specific prior crime or crimes should alert counsel that evidence of all crimes committed as part of the same course of conduct may be offered, and, therefore, substantially complies with the notice requirement of section 190.3." (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 70; *People* v. *Cooper, supra,* 53 Cal.3d 771, 842; *People* v. *Walker* (1988) 47 Cal.3d 605, 637 [253 Cal.Rptr. 863, 765 P.2d 70].) In the instant case, the prosecution's notice informed the defense of the names of each one of the women who had been victimized by defendant's sexual assaults, the specific dates on which those assaults took place, and the counties in which the crimes occurred. The notice was filed well before the commencement of the guilt phase proceedings. In view of these circumstances, the prosecution's notice adequately apprised defendant of the evidence in aggravation that the prosecution intended to introduce. We therefore find no abuse of discretion in the trial court's denial of defendant's motion to strike the notice of aggravation.[30]

### D. *Denial of Motion to Re-Voir Dire the Jury*

Prior to the commencement of the penalty phase, the defense submitted a motion to re-voir dire the jury, in order to establish that there was good cause for impaneling a new jury for the penalty phase. The motion was based on section 190.4, subdivision (c). In pertinent part, that statute provides: "If the trier of fact which convicted the defendant of a crime for which

---

[30]In view of our conclusion that the trial court properly refused to strike the notice of aggravation, we find no merit in defendant's contention that his attorney performed deficiently with regard to this issue. (See *People* v. *Johnson* (1993) 6 Cal.4th 1, 51 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

he may be subject to the death penalty was a jury, the same jury shall consider . . . the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn." The motion requested that the court allow defendant's trial counsel to inquire whether the sitting jurors could keep an open mind. As was the case with a motion for separate juries submitted by defendant at the pretrial stage, the trial court denied the request.

On appeal, defendant contends that the trial court erred in denying the motion, because "good cause" existed to impanel a new jury prior to commencement of the penalty phase. Specifically, defendant asserts that his decision to absent himself from the guilt phase proceedings prior to the giving of closing arguments "likely was interpreted as an admission of guilt and prejudiced him in the eyes of the jury." Defendant further alleges that "certain jurors had preconceived views" about the case, that Jurors Oran Pentz and Deborah Wallen related experiences "similar" to those described at trial, that defendant's penalty phase counsel, Steven Harmon, was absent during the guilt phase, and finally that the prosecution had elected to introduce evidence of "a totally new unrelated homicide" (Shelah McMahan) at the penalty phase. Defendant maintains that in view of these specific factors, good cause existed to grant the motion.

Defendant's argument is unavailing. Section 190.4, subdivision (c), expresses the long-standing legislative preference for a *single* jury to determine guilt as well as penalty in capital cases. (*People* v. *Taylor* (1990) 52 Cal.3d 719, 738 [276 Cal.Rptr. 391, 801 P.2d 1142]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1028-1029 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People* v. *Gonzales* (1967) 66 Cal.2d 482, 499 [58 Cal.Rptr. 361, 426 P.2d 929].) Although "good cause" in the context of impaneling a new penalty phase jury is an elusive concept (see *People* v. *Malone* (1988) 47 Cal.3d 1, 27-28 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1199 [240 Cal.Rptr. 666, 743 P.2d 301]), it seems clear that, similar to the situation found in the cases cited, defendant's speculative assertions in the present case were insufficient to impose any duty of inquiry on the part of the trial court. The court explained to the jury that defendant voluntarily had requested to be absent from closing argument, and later admonished the jury prior to the giving of opening statements at the penalty phase that it was customary for one defense attorney to work on the guilt phase and the other on the penalty phase. The subject of the jurors' attitudes had been examined thoroughly during the voir dire examination conducted at the outset of the guilt phase of the trial. There was nothing unusual about the prosecution's properly noticed intention to introduce evidence, at the penalty phase, of an additional, unadjudicated murder. (See, e.g., *People* v. *Medina* (1990) 51

Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282].) To permit a convicted capital defendant to delay commencement of the penalty phase proceedings on such a speculative basis would contravene the purpose of section 190.4, subdivision (c). The trial court did not err in denying defendant's request to re-voir dire the jury.

### E. *The Admission of Evidence Related to Defendant's Prior Convictions*

At the penalty phase of the trial, the prosecution introduced evidence of defendant's 1973 assault on Debra B. Because defendant had pleaded guilty to misdemeanor charges in that case, the prosecution introduced evidence pertaining to this allegation under section 190.3, factor (b).[31] The prosecution also introduced evidence involving the 1975 attempted burglary with intent to commit rape, involving Deborah T. Because defendant had pleaded guilty to this felony offense, the prosecution introduced testimonial evidence pertaining to this allegation under section 190.3, factor (c).[32]

On appeal, defendant contends the trial court erred in permitting the prosecution to present evidence of the facts and circumstances of defendant's prior convictions. Specifically, he contends that the admission of this evidence over his objection (set forth in a motion to exclude) violated the constitutional proscription against double jeopardy (by impermissibly allowing the jury to hear evidence in support of defendant's conviction of an offense greater than the one of which defendant was convicted by the prior jury), resulted in the introduction of irrelevant and prejudicial evidence, and violated his rights to equal protection of the laws, to a speedy trial, and to a reliable sentencing determination. Defendant's position lacks merit.[33]

We previously have rejected arguments that double jeopardy and speedy trial principles apply to the admission of evidence in aggravation presented at the penalty phase. (See, e.g., *People* v. *Cain* (1995) 10 Cal.4th 1, 71-72 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [double jeopardy]; *People* v. *Garceau, supra,* 6 Cal.4th 140, 199-200 [same]; *People* v. *McDowell* (1988) 46 Cal.3d 551, 568 [250 Cal.Rptr. 530, 763 P.2d 1269] [speedy trial].) Nor was the evidence of defendant's prior convictions irrelevant or unduly prejudicial;

---

[31]Section 190.3, factor (b), permits the trier of fact at the penalty phase to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

[32]Section 190.3, factor (c) permits the trier of fact at the penalty phase to consider "[t]he presence or absence of any prior felony conviction."

[33]Defendant mistakenly asserts that the prosecution introduced evidence of the incidents involving Debra B. and Deborah T. under section 190.3, factor (c). As we have noted in the text, the prosecution relied on section 190.3, factor (b), with regard to the Debra B. incident.

defendant's choking attack upon Debra B. clearly involved "force or violence" within the meaning of section 190.3, factor (b), and his conviction of attempted burglary with the intent to commit rape, stemming from the incident involving Deborah T., fell squarely within the meaning of section 190.3, factor (c), allowing consideration of any prior felony conviction. Contrary to defendant's equal protection argument, the prosecution was not limited to showing that defendant had, in fact, been convicted, but was free to elicit the testimony of witnesses for the purpose of establishing the criminal conduct underlying defendant's prior convictions. (See *People* v. *Karis* (1988) 46 Cal.3d 612, 640 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Gates*, *supra*, 43 Cal.3d 1168, 1203.) We previously have held that the use of live testimony to establish a defendant's prior criminal conduct does not violate a defendant's right to a reliable sentencing determination. (See, e.g., *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1339 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

### F. *Evidence of Prior Crimes Barred by the Statute of Limitations*

As noted above, the prosecution presented evidence of unadjudicated criminal offenses committed by defendant in 1973 and 1975. On appeal, defendant contends that such offenses were "stale" at the time of defendant's trial in 1987-1988, that prosecution of these offenses was barred by the applicable statute of limitations, and that the trial court therefore erred in permitting the introduction of this evidence. Defendant's position is without merit. (*People* v. *Medina* (1995) 11 Cal.4th 694, 772 [47 Cal.Rptr.2d 165, 906 P.2d 2] ["neither remoteness nor the expiration of the statutory limitations period bars admission of a defendant's prior unadjudicated criminal activity for purposes of section 190.3, factor (b)"]; *People* v. *Garceau*, *supra*, 6 Cal.4th 140, 199, and cases cited therein.)

### G. *Defendant's Confession to Unadjudicated Offenses*

On March 5, 1975, as part of the investigation into the incident involving Deborah T., Imperial Beach Police Officer Charles Hamilton informed defendant of his rights under *Miranda* v. *Arizona*, *supra*, 384 U.S. 436, and upon obtaining defendant's waiver, proceeded to ask defendant certain questions involving the matter. Defendant denied having been near the victim's window. After the interview concluded, Hamilton learned that a fingerprint expert had matched defendant's fingerprints to those found on Deborah T.'s window.

The following morning, Hamilton visited defendant at Ream Field, the naval facility where defendant was stationed, and reread defendant his

*Miranda* rights. Defendant said that he understood those rights, and asked: "I have the right to an attorney?" Hamilton responded affirmatively. When defendant asked, "What if I can't afford one?," Hamilton replied, "Then the court will appoint you one." Defendant thereafter asked whether the legal officer of the naval base could serve as his attorney. A naval investigator informed defendant that such an officer could not represent defendant in a civilian court of law. Defendant asked Hamilton whether he was going to be arrested. Hamilton responded affirmatively, informing defendant that approximately four hours would be required to obtain an arrest warrant. Defendant responded: "Okay, I'll talk to you, what do you want to talk about?" He thereafter described his involvement in other attacks upon women.

At trial, defendant objected to the introduction of evidence pertaining to his confession to the unadjudicated offenses, on the ground that the foregoing colloquy evidenced defendant's invocation of his right not to speak with Hamilton. The trial court denied the challenge. On appeal, defendant contends the trial court erred in allowing the prosecution to introduce evidence of defendant's confession, because Hamilton improperly refused to honor defendant's purported request for an attorney.

Defendant's contention is unpersuasive. His inquiries of Officer Hamilton were insufficient to invoke his "Fifth Amendment privilege" to consult with counsel. (*People* v. *Maynarich* (1978) 83 Cal.App.3d 476, 481 [147 Cal.Rptr. 823].) Moreover, after considering Hamilton's responses to his questions, defendant said, "Okay, I'll talk to you," thereby waiving his right to speak with an attorney. (*People* v. *Whitson* (1998) 17 Cal.4th 229 [70 Cal.Rptr.2d 321, 949 P.2d 18].) The record is devoid of evidence that coercion or deception played any role in the interrogation. On these facts, the trial court properly found that defendant had knowingly and intelligently waived his *Miranda* rights.

## H. *Photographic Evidence Regarding the Murder of Shelah*

Defendant contends that the trial court committed reversible error in permitting the prosecution to introduce numerous photographs and photographic slides relating to Shelah's homicide, because such evidence was "gruesome, inflammatory and cumulative." Defendant further alleges that the admission of this evidence violated his constitutional rights to due process of law, a fair trial, a reliable verdict, and fundamental fairness. (See U.S. Const., 5th, 6th, 8th, and 14th Amends.)

We apply the same standard as that used to evaluate defendant's challenge to the photographic evidence introduced against him at the guilt

phase of the trial: " 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' (*People* v. *Crittenden, supra,* 9 Cal.4th [83,] 133-134.)" (*People* v. *Scheid, supra,* 16 Cal.4th 1, 18.)

 As we shall explain, the trial court clearly acted within its discretion in admitting the challenged items. The photographic evidence served to illustrate and corroborate the testimony given by prosecution witnesses regarding Shelah's death and the ensuing investigation.

1. *Exhibits Nos. 80:1-18, 80:26-28, 83:1-14, and 84:1-10—Aerial and General Crime Scene Views, Close-up Photographic Slides of the Victim's Foot, and Views of the Widney Property*

Exhibits Nos. 80:1-18 and 80:28 are aerial views of the area in which the body of Shelah McMahan was found, as well as ground-level shots showing portions of the same general area. Exhibits Nos. 80:26 and 80:27 depict the bottom of Shelah's feet. Exhibits Nos. 83:1-14 and 84:1-10 depict the Widney property. At a hearing held outside the jury's presence to consider the admissibility of this photographic evidence, defense counsel specifically indicated that he had no objection to these slides. To the extent that his present appeal challenges any one of these slides, we conclude that the failure to interpose a timely objection has waived the claim. (Evid. Code, § 353, subd. (a); *People* v. *Zapien, supra,* 4 Cal.4th 929, 979-980.)

Even if defendant properly had preserved the issue, our review of the evidence leads us to conclude that the trial court acted well within its discretion in allowing these slides to be introduced. They depict nothing that even remotely could be considered unduly gruesome in nature.

2. *Exhibits Nos. 80:19-25—Crime Scene Slides*

Exhibit No. 80:19 depicts Shelah's blood-spattered body at the location where she was discovered, wedged beneath a large rock ledge, her shirt pulled down. Exhibit No. 80:20 shows the body from a different angle, revealing her bound forearms. Exhibit No. 80:21 shows a close-up view of the rear portion of Shelah's head, revealing a cord draped around her neck. Exhibit No. 80:22 reveals one of Shelah's bare feet. Exhibit No. 80:23 depicts Shelah's swollen, bloodstained forearms, a cable tie binding her wrists. Exhibit No. 80:24 is a closer shot of Shelah's forearms, more clearly

revealing the bloodstains and ligature marks. Exhibit No. 80:25 shows Shelah's body from behind, lying on a red law enforcement "body bag" and revealing her torn T-shirt, pulled down.

Defendant objected to the introduction of each one of the foregoing seven slides, requesting that the trial court exclude them pursuant to Evidence Code section 352. After reviewing each slide and considering the parties' arguments, the trial court overruled the objections. The court did exercise its discretion to exclude an eighth slide, which it found to be cumulative, as well as a photograph—Exhibit No. 82—that shows Shelah when she was alive, which the trial court excluded on the basis that it could have been construed as a then impermissible form of victim impact statement.[34]

Our own review of the slides that were admitted leads us to conclude that they were highly probative in illustrating the vicious nature of the killing. The unusually small amount of blood depicted in the slides supported the prosecution's theory that Shelah probably was killed elsewhere, then transported to the dump. None of the slides are unduly gruesome or likely to inflame the passion of a jury. Nor are the slides improperly cumulative; each has distinct probative value and, contrary to defendant's contention, the prosecution was not compelled to rely upon only one slide to depict the condition of Shelah's body. (See, e.g., *People* v. *Price, supra*, 1 Cal.4th 324, 440-441.)

### 3. *Exhibits Nos. 81:1-9—Autopsy Slides*

Exhibit No. 81:1 is an autopsy slide that shows one of Shelah's forearms, revealing ligature marks. Exhibit No. 81:2 shows the same forearm from a different angle, revealing a more deeply colored ligature mark. Exhibit No. 81:3 shows the discolored underside of one of Shelah's wrists. Exhibit No. 81:4 is a different view of one of Shelah's wrists, showing ligature marks. Exhibit No. 81:5 reveals a closer view of the wrist depicted in Exhibit No. 81:4. Exhibit No. 81:6 reveals an abrasion and ligature mark on one of Shelah's wrists. Exhibit No. 81:7 is a close-up view that shows primarily the front and right side of Shelah's neck, revealing numerous abrasions. Exhibit No. 81:8 is a close-up view of the front and left portions of Shelah's neck, showing abrasions. Exhibit No. 81:9 is a closer view of the abrasions on the

---

[34]See *Booth* v. *Maryland* (1987) 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440], overruled in *Payne* v. *Tennessee* (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720].

right side of Shelah's neck; some of the abrasions appear to correlate to the outline of a hand.[35]

Defendant objected to the introduction of each one of the foregoing nine slides, requesting that the trial court exclude them pursuant to Evidence Code section 352. After reviewing each slide, and considering the parties' arguments, the trial court overruled the objections.

The trial court's rulings were correct. The autopsy slides provided a vivid illustration of the bondage endured by Shelah. This evidence supported the prosecution's theory that the killing was premeditated. (See *People* v. *Scheid, supra,* 16 Cal.4th 1, 18; see also *People* v. *Crittenden, supra,* 9 Cal.4th 83, 134; *People* v. *Garceau, supra,* 6 Cal.4th 140, 180-182.) The evidence also links defendant—a man known to favor handcuffs and to have access to cable ties—to the killing. The slides that show Shelah's neck wounds suggest the savage nature of the killing. This photographic evidence is highly probative and neither unduly gruesome nor inflammatory. Nor is the evidence cumulative; because several of the slides show the ligature marks from different angles, they aided the prosecution in establishing that Shelah had been bound by the handcuffs and the type of cable tie that officers recovered in or around defendant's residence.

### 4. *Exhibits Nos. 90-94—Photographs of Other Evidence*

Exhibit No. 90 is a color photograph that shows a cable tie recovered from defendant's residence. Exhibit No. 91 is a photograph that shows a case for a set of handcuffs. Exhibits Nos. 92 and 93 show the handcuffs partially buried in the shed behind defendant's residence. Exhibit No. 94 shows the disturbed dirt floor area of the shed.

These photographs illustrate the testimony of law enforcement officers who searched defendant's residence and the surrounding area shortly after his arrest. The images further link defendant to the killing. The trial court properly found that these photographs are probative and neither inflammatory nor unduly gruesome.

### 5. *Exhibits Nos. 101-104—Springer Comparison Photographs*

As noted earlier, Criminalist Faye Springer testified regarding the handcuff marks found on Shelah's forearms. As part of her testimony, she explained that she had applied the handcuffs recovered by the police during

---

[35]The prosecution also introduced 11" x 14" photographic enlargements of Exhibits Nos. 81:1, 81:2, 81:3, and 81:5. (Exhibits Nos. 106, 109, 108, 107, respectively.)

their search of defendant's residence and the surrounding area, to her husband's wrist in an effort to create marks on his skin that could be compared with those found on Shelah's wrists. Exhibit No. 101 shows the handcuffs on her husband's wrist, and Exhibits Nos. 102-104 show the marks left by the handcuffs.

This photographic evidence is probative insofar as it helped the prosecution establish that the handcuffs located by the police in their search were capable of making the marks found on Shelah. The evidence therefore was probative. It was neither unduly gruesome nor inflammatory.[36]

### 6. *Exhibits Nos. 111, 113-115—Crime Scene Photographs*

Exhibit No. 111 shows Shelah's body lying facedown on the body bag, similar to the view depicted in Exhibit No. 80:25, but also depicting a police evidentiary ruler, which provided a sense of scale to the image. Exhibit No. 113 is a small photograph showing the dump area and a portion of a law enforcement vehicle. Exhibit No. 114 is identical to Exhibit No. 80-18, showing Shelah's body nestled beneath the rock ledge and partially obscured by weeds and bags. Exhibit No. 115 also depicts the partially obscured body, from an angle that shows the body wedged beneath the rock ledge.

This photographic evidence aided the jury in visualizing the rural setting where the body was found, the body's remote resting place, and the obviously criminal nature of the victim's death. The evidence is probative and not unduly gruesome or inflammatory.

### 7. *Summary*

Insofar as defendant contends that the trial court was required to exclude some or all of the prosecution's photographic evidence under Evidence Code section 352 because such evidence was cumulative of the testimonial evidence presented, the trial court correctly overruled his objection. (See *People v. Scheid, supra,* 16 Cal.4th 1, 19, and cases cited therein.) To the extent defendant contends that the photographic evidence was unduly cumulative to other physical evidence or cumulative in and of itself, we reject that theory as well. (See *People v. Thompson, supra,* 45 Cal.3d 86, 115-116.) The prosecution was entitled to rely upon photographic evidence to help establish

---

[36]Defendant contends that "in addition to the excessive number of slides described, thirteen more photographs of the handcuff marks on Ms. McMahan's wrists were shown to the jury," citing Exhibits Nos. 90-94, 101-104, and 106-109. Defendant overstates his argument; as we have seen, Exhibits Nos. 90-94 and 101-104, did not depict Shelah's wrists, and Exhibits Nos. 106-109 were the photographic prints shown in the slides labeled Exhibits Nos. 81:1, 81:2, 81:3, and 81:5.

the vicious, premeditated nature of the killing, as well as the connection to defendant.

Crime scene and autopsy photographs that graphically depict the circumstances of the crime are plainly relevant to a jury's determination as to whether the death penalty is appropriate. (*People* v. *Wash, supra*, 6 Cal.4th 215, 266; *People* v. *Raley, supra*, 2 Cal.4th 870, 914.) The trial court reasonably could have found that the probative value of the photographic evidence outweighed its potentially prejudicial effect. We therefore conclude that the trial court did not abuse its discretion under Evidence Code section 352 in admitting the photographic evidence. (See *People* v. *Scheid, supra*, 16 Cal.4th 1, 20, and cases cited therein.)[37]

Moreover, a great deal of other evidence linked defendant to Shelah's murder, including his confession to Randy Gresham, physical evidence (handcuffs, cable ties), and defendant's interest in the bondage of women. Thus, even if we were to agree with defendant that the photographic evidence was unduly cumulative in nature, any error in admitting a few too many images clearly would be harmless.

I. *Section 190.3, Factor (b): Evidence Pertaining to the Murder of Shelah*

As discussed above, as part of its case-in-aggravation the prosecution introduced evidence involving the murder of defendant's niece and next-door neighbor, Shelah, pursuant to section 190.3, factor (b). Defendant contends the trial court committed reversible error in admitting such evidence. Specifically, he asserts: (1) the court should have excluded evidence of uncharged criminal activity that occurred subsequent to the charged capital offense in this case, (2) the court erred in denying his request for an advisory jury or, in the alternative, for a hearing pursuant to Evidence Code section 402, (3) the evidence pertaining to Shelah's murder was insufficient to allow a rational trier of fact to determine beyond a reasonable doubt that defendant committed the murder, and (4) the court erred in denying defendant use immunity to enable him to testify on his own behalf. As we shall explain, none of defendant's assertions have merit.

1. *Subsequent Criminal Activity*

We repeatedly have rejected claims, identical to that made by defendant, that criminal activity occurring subsequent to the commission of the charged

---

[37]We reject defendant's constitutional claims, because counsel failed at trial to object based on any such grounds, thereby waiving these claims. (See *People* v. *Crittenden, supra*, 9 Cal.4th 83, 135, fn. 10, and cases cited therein.) Even if the claims had been raised in the trial court, we would find no constitutional error, in view of our determination that the photographic evidence properly was admitted. (*Ibid.*)

offense is inadmissible under section 190.3, factor (b). (See, e.g., *People* v. *Balderas* (1985) 41 Cal.3d 144, 201-204 [222 Cal.Rptr. 184, 711 P.2d 480]; see also *People* v. *Hovey* (1988) 44 Cal.3d 543, 577-579 [244 Cal.Rptr. 121, 749 P.2d 776].) Defendant urges this court to reconsider that line of case authority, but fails to provide us with a persuasive basis for reconsidering our prior holdings. We therefore decline to do so.

2. *Motion for an Advisory Jury or, Alternatively, a Hearing Pursuant to Evidence Code Section 402*

Prior to the commencement of trial, defendant moved to impanel an advisory jury or, alternatively, to conduct a hearing pursuant to Evidence Code section 402 for the purpose of determining whether the penalty phase jury should consider evidence of unadjudicated criminal activity, most notably the evidence linking defendant to Shelah's murder. The trial court denied defendant's request, instead requiring the prosecution to make a foundational offer of proof. The prosecution made its offer to the satisfaction of the trial court.

On appeal, defendant contends the trial court erred in denying his motion. His position is unpersuasive. The trial court was not required to engage either in the time-consuming process of impaneling an advisory jury, or conducting an evidentiary hearing that might have required witnesses to testify once at the hearing and again at the penalty phase. The trial court correctly determined that a juror at the penalty phase was entitled to consider "other crimes" evidence in aggravation that he or she found to be proved beyond a reasonable doubt. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 97-98.) Contrary to the implication inherent in defendant's contention, the jury need not have unanimously agreed that the prosecution met its burden of proof as to the "other crimes" evidence before a single juror could consider that evidence. (See *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 106 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Miranda, supra,* 44 Cal.3d at p. 99.) Unanimity was mandated only with regard to the final determination as to penalty. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 773-774 [239 Cal.Rptr. 82, 739 P.2d 1250].) The jury was so instructed.

3. *Sufficiency of the Evidence*

Defendant contends that the evidence pertaining to Shelah's murder was insufficient to permit a reasonable trier of fact to determine, beyond a reasonable doubt, that he committed the murder. We disagree.

The evidence established that defendant was the last person to see Shelah alive. He had ready access to the residence where she slept. His whereabouts

during the early morning period when the murder occurred were inconsistently explained to investigators. The evidence presented to the jury indicated that Shelah was not the sort of child to leave the residence with a stranger; defendant, however, was her uncle. There were no signs of a struggle in the area where she slept.

When Shelah's body was recovered, her forearms and wrists bore ligature marks, suggesting that she had been handcuffed. Defendant owned handcuffs and had expressed an affinity for sexual bondage. In a shed near defendant's residence, investigators recovered buried handcuffs stained with blood of a type consistent with Shelah's. Only eight out of one thousand individuals share this blood type. The handcuffs also bore fiber evidence similar to the fibers from the T-shirt Shelah was wearing when her body was discovered. Shelah's wrists were bound with a black cable tie that was identical to one found in defendant's residence. Shortly after Shelah's murder, defendant was seen grading his yard.

Defendant's cellmate, Randy Gresham, testified that defendant admitted killing Shelah and demonstrated how he had stabbed her. Defendant also expressed concern that investigators might uncover evidence in his yard.

The foregoing evidence was sufficient to allow a rational trier of fact to determine beyond a reasonable doubt that defendant murdered Shelah.

### 4. *Defendant's Request for Use Immunity*

Defendant contends that the trial court erred in denying his motion that he be granted use immunity to enable him to testify in his own behalf regarding the murder of Shelah. He asserts that his inability to testify without relinquishing fundamental rights, such as the privilege against self-incrimination, "reinforced the inference of guilt and hence, the jury's prejudice against him." Both the United States Supreme Court and this court have considered and rejected similar arguments. (See *McGautha* v. *California* (1971) 402 U.S. 183, 213-220 [91 S.Ct. 1454, 1470-1474, 28 L.Ed.2d 711], vacated on other grounds in *Crampton* v. *Ohio* (1972) 408 U.S. 941 [92 S.Ct. 2873, 33 L.Ed.2d 765]; *People* v. *Bonin* (1989) 47 Cal.3d 808, 852 [254 Cal.Rptr. 298, 765 P.2d 460].) Defendant fails to persuade us to reexamine the merits of these prior decisions.

### J. *Other Crimes Instruction*

The trial court gave the standard instruction prohibiting the jury from considering other violent crimes admitted in aggravation under section

190.3, factor (b), unless these crimes had been proved beyond a reasonable doubt. The instruction did not describe or otherwise identify any of the acts to which it might apply. The prosecutor and defense counsel approved the instruction as given; defense counsel in fact requested that the trial court not delineate the specific criminal acts that the jury would be permitted to consider.[38]

Defendant contends that the trial court's failure to instruct, sua sponte, on the elements of the crimes proved under section 190.3, factor (b), rendered unreliable the jury's penalty determination. We repeatedly have rejected the identical contention in other cases, observing that there is no duty, absent a request, to so instruct. (See, e.g., *People* v. *Barnett* (1998) 17 Cal.4th 1044, 1175 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People* v. *Osband* (1996) 13 Cal.4th 622, 704 [55 Cal.Rptr.2d 26, 919 P.2d 640].) The rule "is based in part on a recognition that, as [a] tactical matter, the defendant 'may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes because he may fear that such instructions could lead the jury to place undue emphasis on the crimes rather than on the central question of whether he should live or die.' [Citations.] We have also noted a trial court is not *prohibited* from giving such instructions on its own motion when they are 'vital to a proper consideration of the evidence.' [Citation.]" (*People* v. *Cain, supra,* 10 Cal.4th 1, 72, original italics].) Defendant does not provide us with a principled basis for reconsidering these decisions, and we decline to do so.

Defense counsel's explicit approval of the instruction indicated a clear preference for the standard, general language, rather than a recitation of the litany of defendant's uncharged criminal activity. Defendant now contends that trial counsel's failure to request a more detailed instruction amounted to ineffective assistance. In view of the nature of defendant's prior criminal conduct, however, counsel's decision obviously was a reasoned, tactical one. (See, e.g., *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 592 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; see also *People* v. *Pope* (1979) 23 Cal.3d 412, 426, fn. 16 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) The trial court was under no duty to "override" defense counsel on this point and instruct the jury as to *the individual elements of the crimes proved.* No error or constitutionally deficient assistance appears.

---

[38]The instruction stated: "Evidence has been introduced for the purpose of showing that the defendant has committed criminal acts which involved the express or implied use of force or violence or the threat of force or violence. Before you may consider any of such criminal acts as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such acts. You may not consider any evidence of any other criminal acts as an aggravating circumstance." (See CALJIC No. 8.84.1.2 (1983 new).)

In any event, we reject defendant's contention that the absence of such an instruction tainted his trial. Our review of the record discloses convincing evidence of criminal activity properly admitted under section 190.3, factor (b). There is no indication that an instruction on the specific crimes and elements would have changed the jury's assessment of the evidence or would have affected the outcome of the trial.

### K. *The Testimony of Cindy Widney*

The defense presented evidence in mitigation to the effect that defendant was a loving and devoted husband. Several witnesses testified to his good character in this regard.

The prosecution thereafter sought to rebut this "good-character" evidence by offering the testimony of defendant's sister-in-law, Cindy Widney, who was prepared to describe unwelcome overtures that defendant had made to her.

The defense sought exclusion of the proffered evidence on the grounds of lack of relevance and undue prejudice. (See Evid. Code, §§ 210, 352.) After considering the parties' arguments at a hearing held outside the jury's presence, the trial court concluded that because the defense had portrayed defendant as a loving husband, the proffered evidence properly could be admitted in rebuttal, and on that basis denied defendant's request.

Widney thereafter testified during the prosecution's case-in-rebuttal that defendant once attempted to kiss her and on another occasion said to her, "I've been dreaming of you." On a third occasion, defendant mentioned to her in a joking manner that "maybe they [i.e., their respective spouses] should go back to mom and dad and we should get married." On a fourth occasion, defendant appeared at the front door of Widney's residence; frightened by his presence, she telephoned a neighbor, who observed defendant enter Widney's home through a side entrance. Widney retrieved a baseball bat and confronted defendant, who was standing inside her home. Defendant explained that his presence emanated from a concern for her. "I didn't know if you were raped, hurt or what," he told her.

On appeal, defendant contends that because the testimony of Cindy Widney did not involve the commission of an actual crime, admission of the evidence was improper under section 190.3, factor (b). Defendant mischaracterizes the basis upon which the trial court admitted this evidence. As noted, it was not offered as criminal activity pursuant to section 190.3, factor

(b), but as relevant evidence to rebut the portrayal of defendant as a loving and caring husband. (§ 190.3.)[39]

Defendant further contends that this evidence constituted improper rebuttal. The admission of evidence in rebuttal is a matter left to the sound discretion of the trial court. (*People* v. *Raley, supra,* 2 Cal.4th 870, 912.) The court's decision in this regard will not be disturbed on appeal in the absence of "palpable abuse." (*People* v. *Kelly* (1990) 51 Cal.3d 931, 965 [275 Cal.Rptr. 160, 800 P.2d 516]; see also *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 142 [2 Cal.Rptr.2d 335, 820 P.2d 559], vacated on other grounds, 506 U.S. 802 [ 113 S.Ct. 32, 121 L.Ed.2d 5], judg. affd. on remand, 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808] [defendant's presentation of evidence in mitigation as to his good character "open[s] the door to prosecution evidence tending to rebut" that specific aspect of defendant's personality].) In the present case, the trial court did not abuse its discretion in concluding that defendant, by introducing character evidence suggesting that he was a good and loving husband, "opened the door" to the prosecution's evidence in rebuttal.[40]

Moreover, even if we were to assume that the admission of Cindy Widney's testimony was improper, such error would not have been prejudicial. Defendant stood convicted of having committed one brutal murder in addition to multiple sexual assaults. The prosecution's penalty phase evidence also overwhelmingly established defendant's culpability for the murder of his 11-year-old niece and assaults upon other women. Against this backdrop of violent crime, no reasonable possibility exists that the jury would have rendered a different penalty phase verdict had Cindy Widney's testimony been excluded. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

---

[39]Section 190.3 provides in pertinent part: "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence, *and the defendant's character, background, history,* mental condition and physical condition." (Italics added.)

[40]In view of our conclusion that the testimony of Cindy Widney constituted proper rebuttal, and in view of defendant's failure to request a limiting instruction, we reject defendant's contention that the trial court's failure to instruct the jury "about the limited purpose for which [the jury] could consider such rebuttal evidence" violated defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Moreover, there is no indication that the jury may have considered this rebuttal evidence for an improper purpose.

## L. *Governor's Commutation Power*

Prior to the prosecution's opening statement at the penalty phase, the court received a note from one of the jurors. The note read: "Does life in prison without the possibility of parole mean he will never get out under any circumstances?" Outside the jury's presence, the court discussed the matter with counsel. Defense counsel expressed reservations about the jury's being informed of the Governor's power to commute a sentence of death or a sentence of life in prison without the possibility of parole.[41] The prosecutor urged the court to follow this court's decision in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], wherein we held: "When the jury raises the commutation issue itself—either during voir dire or in a question posed to the court during deliberations—the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence. [Citation.]" (37 Cal.3d at p. 159, fn. 12.) In response to the juror's inquiry, the trial court expressed the views set forth in the margin.[42]

■■■ On appeal, defendant contends the trial court's comments were misleading in failing to indicate that four members of this court would be

---

[41]Defense counsel favored responding to the juror's inquiry as follows: "[T]he jury will be instructed and you will be instructed that the sentencing means what they say, that you will have two choices, he will either get death or he will be in prison without the possibility of parole, life without possibility of parole."

[42]The trial court informed the jury: " 'Does life in prison without the possibility of parole mean he will never get out under any circumstances?' That question causes the Court a great deal of concern and it's caused other courts a great deal of concern, and the reason why, it has an element of speculation in it, it shows that people are worrying about what's going to happen after the decision in this particular case.

"It really is inappropriate for the—for jurors or for me to rely or even to think about that kind of material, because I don't know what's going to happen because it's speculation, number one, and, secondly, to the extent that people are worrying about someone else doing something, they may take their present job less seriously.

"Let me just say, the law does have a provision in the California Constitution that the Governor does have the power to commute both sentences, both the death sentences and the life without possibility of parole sentence to something less than that, if the Governor sees fit.

"Now, I've been in the criminal justice system for 13 years and I've never seen the commutation power used. Given the way things are now, I can't imagine in this particular case that power applying.

"I think if you approach this case from any other perspective other than death means death or life without possibility of parole means exactly that, you would be deluding yourself. I think you've got to resign yourself that the two choices that you're going to make here are the two sentences that are going to be carried out in this particular case.

"Is everybody clear as to what my feelings are? And I think for you to speculate anything else would be inappropriate."

required to concur in the exercise of the Governor's commutation power. (Cal. Const., art. V, § 8, subd. (a) ["The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring."].) Defendant also alleges error on the basis that the instruction, by implying that the ultimate sentencing responsibility resided in someone other than the jury, inappropriately diminished the jury's sense of responsibility for its sentencing decision. Defendant further contends that the instruction failed to admonish jurors sufficiently regarding their duty to disregard information pertaining to the commutation power. Defendant contends that in view of these alleged flaws, his rights to a fair trial, reliable determination of penalty, due process of law, and fundamental fairness were violated, necessitating reversal of the sentence.

In supplemental briefing filed with this court, defendant contends that several recent federal court decisions support his position that the trial court's response to the jury's inquiry was fatally defective. (See *Coleman* v. *Calderon* (9th Cir. 1998) 150 F.3d 1105 [trial court's erroneous instruction on commutation power warranted habeas corpus relief], revd. *sub nom. Calderon* v. *Coleman* (1998) 525 U.S. 141, __ [119 S.Ct. 500, 502-504, 142 L.Ed.2d 521] [federal circuit court of appeals erroneously granted habeas corpus relief based on trial court's allegedly inaccurate instruction on commutation power without first applying harmless error standard]; *McLain* v. *Calderon* (9th Cir. 1998) 134 F.3d 1383, 1384-1386 [trial court's erroneous instruction on commutation power warranted habeas corpus relief]; *Hamilton* v. *Vasquez* (9th Cir. 1994) 17 F.3d 1149 [same].) He further contends that the trial court's response constituted "structural" error (see *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 306-310 [111 S.Ct. 1246, 1262-1265, 113 L.Ed.2d 302]) reversible without regard to an examination of prejudice (*ibid.*; see also *People* v. *Flood* (1998) 18 Cal.4th 470, 493 [76 Cal.Rptr.2d 180, 957 P.2d 869]), and even if deemed to be nonstructural, the response was prejudicial under the standard set forth in *Chapman* v. *California, supra,* 386 U.S. 18, 24 [87 S.Ct. 824, 828].

The prosecution contends that defendant's argument was waived for want of a timely objection and that defense counsel in fact "accepted" the response as proposed by the trial court before the court addressed the jury. The record is ambiguous as to whether defense counsel in fact acquiesced in the trial court's response as actually given.[43] It is clear, however, that defense counsel never suggested that the trial court's reference to the Governor's commutation power was misleading because of the absence of a

---

[43]Defense counsel informed the trial court: "Your honor, not backing off of my argument, but under the circumstances, I would be willing to accept it."

reference to this court's role in clemency decisions involving twice convicted felons.

Assuming that the issue properly may be raised on appeal, we reject defendant's contention that the trial court's comments to the jury on this point constitute reversible error. In view of this court's prior decisions, we believe that once a juror inquired as to the actual meaning of a sentence of life without possibility of parole, the trial court did not err in explaining that although the Governor has the power to commute both a sentence of death and a sentence of life without possibility of parole, it would be inappropriate for the jury to approach the case "from any other perspective other than death means death and life without possibility of parole means exactly that . . . ." (See, e.g., *People* v. *Hunter* (1989) 49 Cal.3d 957, 983-984 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Hovey, supra,* 44 Cal.3d 543, 583-584 [approving similar responses to such inquiries].) Further, although the trial court's comments would have been more complete and fully accurate had they noted that, in the case of a "twice-convicted" felon such as defendant,[44] the Governor may not grant clemency without the favorable recommendation of four or more justices of this court, we do not believe that this omission rendered the trial court's comments so incomplete or misleading as to be constitutionally deficient under the federal constitutional standard established in *California* v. *Ramos* (1983) 463 U.S. 992, 1010-1012 [103 S.Ct. 3446, 3458-3459, 77 L.Ed.2d 1171], or that the omission, even if error, was prejudicial under the *Chapman* standard. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [87 S.Ct. 824, 828].)[45]

The crucial point and overall thrust of the trial court's comments was to inform the jurors that *any speculation* on the part of a juror that life without the possibility of parole meant anything other than precisely that *would be inappropriate,* and thus the comments properly informed the jurors that they were not to consider the commutation power at all in arriving at their sentencing determination. In light of this message, the circumstance that the trial court's comments did not explain the existence of a limitation on the Governor's commutation power is insignificant. The comments were sufficient to advise the jurors not to consider the speculative possibility of

[44]Contrary to the People's argument, the phrase "twice convicted" in article V, section 8, subdivision (a) of the California Constitution does not apply only to defendants who have two *prior* felony convictions in addition to their current felony offense, but also applies to a defendant whose current offense is a felony and who has one prior felony conviction. (See *Green* v. *Superior Court* (1934) 2 Cal.2d 1, 3 [37 P.2d 694].)

[45]Although defendant contends the trial court's comments, if erroneous, constituted "structural error," we believe it is clear that this type of error is "trial error" of a nature that its harmfulness must be evaluated under the *Chapman* standard. (See, e.g., *People* v. *Flood, supra,* 18 Cal.4th 470, 492-504.)

commutation. The specific details of the commutation process (that the jurors were not to consider) bore no relevance to the jury's task. Under these circumstances, we conclude there is no reasonable possibility that the incompleteness of the trial court's comments affected the result.

### M. *Constitutionality of California's Death Penalty Law*

Defendant contends that California's death penalty law is overly broad, impermissibly vague and excessive, and constitutes cruel and unusual punishment prohibited by the federal and California Constitutions. In upholding the constitutionality of California's death penalty law, we previously have rejected arguments similar to that raised by defendant, and he fails to provide a persuasive basis for this court to reconsider our earlier decisions. (See, e.g., *People* v. *Garceau, supra,* 6 Cal.4th 140, 207; *People* v. *Alcala* (1992) 4 Cal.4th 742, 809 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].). We therefore reject his claim.

### N. *Defendant's Application to Modify the Verdict*

The trial court denied defendant's automatic application for modification of the jury's verdict (§ 190.4, subd. (e)).

On appeal, defendant contends the trial court relied on evidence in aggravation that was improperly admitted or not supported by the evidence, "including the McMahan murder, the San Diego priors, the Cindy Widney evidence, and the Gresham evidence."

The record does not support defendant's position. The evidence of Shelah's murder, the San Diego priors, and the testimony of Randy Gresham properly were admitted for the reasons previously stated, and the trial court was authorized to rely upon such evidence in considering defendant's application for modification of the death verdict. (§ 190.4, subd. (e).) Contrary to defendant's assertion, nothing in the record suggests that the trial court relied on the testimony of Cindy Widney in denying defendant's application.

The trial court was required to reweigh independently the aggravating and mitigating circumstances, and determine whether, in its independent judgment, the weight of the evidence supported the jury's verdict. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 705 [286 Cal.Rptr. 801, 818 P.2d 84].) We are convinced the court fulfilled its duty. The court reviewed in detail the aggravating and mitigating circumstances and explained the basis for its denial of defendant's application. The court's reasoning was well supported

by the evidence, and its conclusion was apt: "[T]he Court finds the circumstances of this case to be far more aggravating than would even be expected in a case as serious as a capital case. . . . [¶] . . . [¶] The nature of these crimes can only be characterized as the stuff of which nightmares are made."

### O. *Whether the "Three Strikes" Law Repealed the Death Penalty*

Defendant contends the judgment of death should be reversed because the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12) repealed the death penalty in California. We previously have rejected similar claims. (See *People* v. *Samayoa* (1997) 15 Cal.4th 795, 861-862 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People* v. *Alvarez* (1996) 14 Cal.4th 155 [58 Cal.Rptr.2d 385, 926 P.2d 365]; see also *People* v. *Williams* (1995) 40 Cal.App.4th 446, 457-458 [46 Cal.Rptr.2d 730].) Defendant presents no persuasive reason for this court to reconsider its previous holdings. We therefore reject his claim.

### DISPOSITION

The judgment is affirmed in its entirety.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied July 21, 1999, and the opinion was modified to read as printed above.